IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

JOHNNY W. POPE, II,                  :
                                  :
                  Plaintiff,         :
                                    :          Civil Action No. 2:21cv449
v.                               :
                                    :
WESTERN TIDEWATER              :
COMMUNITY SERVICES BOARD,    :
                                  :
                  Defendant.     :

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Defendant, Western Tidewater Community Services Board, ("WTCSB"), by counsel, hereby submits this Memorandum of Law in Support of its Motion for Summary Judgment.  In his Complaint, plaintiff, Johnny W. Pope, II, a former WTCSB employee, claims that he was subject to disability discrimination and retaliation under the Americans with Disabilities Act ("ADA") and to race and gender discrimination and retaliation under Title VII.

The evidence wholly belies plaintiff's claims. With regard to the ADA, plaintiff never requested a reasonable accommodation, nor is there evidence of retaliation based upon a disability.  As to Title VII, plaintiff cannot point to a similarly situated individual or to any instance when he was treated differently based on his race or gender.  Nor is there evidence of retaliation or a causal relationship between plaintiff's lateral transfer or discharge and his claimed disability, race, or gender.

The material facts are clear and undisputed:

- Over time, plaintiff's performance and attendance deteriorated and supervisors had difficulty communicating with him, leading to disciplinary action and Performance Evaluation Plans.

- Plaintiff refused to participate in a mandatory referral to the Employee Assistance Program (EAP), grounds for insubordination under the WTCSB's Standards of Conduct.

- In lieu of a Group III disciplinary notice that could lead to termination, plaintiff was offered a lateral transfer to a different program with a different supervisor.

- Plaintiff did not think transferring from his preferred position was "fair," and following his reassignment, stopped going to work.

- Plaintiff was allowed to use months of accrued leave and to maintain his medical benefits.

- For six months, plaintiff refused all requests for medical or FMLA documentation substantiating his absence, at which point the WTCSB terminated his employment.

Absent any genuine dispute of material fact, and for the reasons stated below, the WTCSB asks the Court to enter summary judgment in its favor, and to dismiss plaintiff's claims based on his inability to establish a cognizable ADA or Title VII discrimination or retaliation claim.

## I.     STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Demetrios Peratsakis ("Peratsakis") is the Executive Director of the WTCSB. Peratsakis first hired plaintiff on July 6, 2005 as an hourly Program Assistant. On February 21, 2021, Peratsakis terminated plaintiff's employment as a Clinician II. (Ex.1, Peratsakis Aff.; Ex. 2, Pope Position Summary)

2.     Plaintiff earned a Bachelor of Science in Psychology in 2010.  Following part-time roles with the WTCSB during summers and one school semester, in August 2014 plaintiff applied for and was hired as a Program Technician in a residential program with the title of Clinician I/Counselor I.  In May 2015 plaintiff became a Clinician II/Counselor II.  At all times relevant to his Complaint, plaintiff was a Qualified Mental Health Professional ("QMHP").

Plaintiff has no formal education, training, or certifications in computer networking, hardware, or software. (Ex. 3, Johnny Pope Dep., pp. 8-9; Ex. 2, Pope Position Summary; Ex. 4, QMHP Certification)

3.      In accepting employment with the WTCSB, plaintiff agreed as follows:

> If employed, I understand that the WTCSB has the right, at any time, to effect a lateral transfer of me/my position. Lateral transfer is defined as a change in job assignment, responsibilities and/or classification that retains at least my current salary level and requires job performance consistent with my qualifying education, experience, and credentials.

(Ex. 5, WTCSB Agreements and Certifications, executed 2/20/14)

4.      Plaintiff also received the WTCSB Employee Handbook which addresses, *inter alia*, expectations, timekeeping, standards of conduct, attendance and punctuality, and communications. With regard to timekeeping, the Handbook sets forth that: "WTCSB tracks employee time through KRONOS Workforce Ready.  Employees are expected to record their time vis the KRONOS Workforce Ready Mobile App or on their desktop/laptop."  (Ex. 6, Employee Handbook)

5.      Plaintiff was also subject to all WTCSB Policies, including Policy 7.2, Standards of Conduct.  Policy 7.2 includes the WTCSB's progressive disciplinary procedure and:

> [S]erves as a guide to the professional behavior and proper business practices essential to the sound operation of a supportive workplace environment and public treatment agency. As such, they serve to help assure that staff conduct themselves in a responsible and productive manner and that management is supported in its efforts to provide remedial, corrective and disciplinary action when unsatisfactory work performance, improper conduct or violations of the Standards of Conduct occur.

(Ex.7, Policy 7.2)

6.      Plaintiff's mother, Theresa Pope, has been employed by the WTCSB for decades and is currently the Administrator for Case Management. At all times relevant to plaintiff's

Complaint, she was a member of the senior leadership team. Ms. Pope's late son, Chad Pope, was a client of the WTCSB prior to his death and the agency has a building named for him. Given this history, Peratsakis mentored plaintiff and promoted his professional development. (Ex. 1, Peratsakis Aff.; Ex. 8, Theresa Pope Dep, p. 18; Ex. 3, Johnny Pope Dep, pp. 48-49)

7.      Plaintiff's lack of accountability and response to constructive criticism led to conflicts with multiple supervisors and to Peratsakis's making periodic changes in plaintiff's assignment.  For example, in July 2017, plaintiff was moved to Prevention Services as a Program Specialist. In plaintiff's Performance Evaluation from October 2016-October 2017, his supervisor, Dr. Carletta Perry, wrote:

> Improvement is needed in several areas. According to previous supervisor Cynthia Ellison, Johnny appears to be above reproach. He is verbally combative and appears to have difficulty in responding to directives. According to previous supervisor, Iesha Perry, Johnny has difficulty receiving constructive criticism. As his current supervisor, I concur with the previous supervisors and have expressed concern regarding Johnny's need to improve his professional demeanor (attitude and behavior) when interacting with his Supervisor, colleagues and the public.

Dr. Perry's Letter of Caution, which reflects a "performance deficiency or conduct infraction," cited plaintiff for "disruptive behavior, demeanor or conduct." (Ex. 1, Peratsakis Aff.; Ex. 2, Pope Position Summary; Ex. 9, Perry Letter of Caution and Performance Evaluation)

8.      In December 2017 plaintiff was reassigned as Clinical Team Lead in Court Services, under the supervision of Latril Mariano.  Mariano had difficulty supervising plaintiff due to his failure to show up for work without notification by text or phone; failure to clock in or out using the WTCSB timekeeping system; failure to report to his assigned work site or report his whereabouts; refusing to follow directions; and being argumentative.  On February 20, 2018, Mariano wrote to her Director, Donna Boykin, "It does not matter what I tell him he does what he want[s] anyway." (Ex. 10, Mariano Memo;  Ex. 11, 2/20/18 Mariano email)

9.      Due to plaintiff's difficulties with supervisors, and seeing his ability to manage and organize data, Peratsakis reassigned plaintiff on March 5, 2018 from a clinician role to the position of Administrative Specialist under the supervision of Brandon Rodgers ("Rodgers"), Director of Operations.  Plaintiff's grade and pay remained the same. (Ex. 1, Peratsakis Aff.; Ex. 2, Pope Position Summary)

10.     Plaintiff was assigned to the Program Development Team ("PDT"), which Rodgers oversaw.  The PDT, first assembled in late 2014-2015, was responsible for grants and new program incubation and launch, and was composed of employees with relevant skill sets drawn from across the agency, such as Human Resources, Licensing Regulations, Documentation Management and Quality Assurance, Financial Regulation, Electronic Health Records, and Clinical Guidance.  Members of the PDT had different responsibilities based on their skill sets and different supervisors based on their positions in the agency. Some had ongoing responsibilities factoring into many of the team's projects, while others were brought on as needed for specific projects. (Ex. 1, Peratsakis Aff.; Ex. 12, 30(b)(6) Dep., pp. 40-42)

11.     Plaintiff worked in business informatics and was tasked with data visualization and management of WTCSB's social media and website and became adept at business informatics, including developing an expertise in Business Intelligence Reporting in the Electronic Health Record, particularly after WTCSB sent him to a multi-day off-site training in Rockville, MD in November 2018. (Ex.13, Rodgers Aff.; Ex. 14, Status Reports)

12.     On October 22, 2018, plaintiff received a salary increase from $38,000 to $41,000 and the title of Information Systems Specialist.  He received another increase on May 6, 2019, to $44,000, and was assigned additional duties including grant development and participation in a

state-wide CSB Data Management Committee co-chaired by Rodgers.    (Ex. 1, Peratsakis Aff.; Ex. 2, Pope Position Summary; Ex. 14, Status Reports; Ex. 13, Rodgers Aff.)

13.     Throughout the remainder of 2018 and into 2019, Rodgers had supervisory meetings with plaintiff, per WTCSB Policy 6.1.1, Performance Planning and Evaluation. Rodgers also had informal contact with plaintiff on an almost daily basis, in person, or through emails, texts, or calls.  In addition, the PDT had regular meetings at a set time/place which all members, including plaintiff, were expected to attend.  (Ex. 13, Rodgers Aff.; Ex. 15, Policy 6.1.1)

14.     As 2019 progressed, plaintiff's performance began to suffer. Rodgers received numerous reports from plaintiff's co-workers about his behavior in meetings and contributions to team assignments. Plaintiff failed to accept responsibility for incomplete work or missed assignments and, in a matter of months, his attendance went from excellent to sporadic and he refused to document his time through KRONOS or his project logs.  Rodgers continued to counsel plaintiff about his behaviors and performance. (Ex.13, Rodgers Aff.; Ex. 16, Rodgers Dep., p. 11-13)

15.     Later in 2019, plaintiff expressed to Rodgers that he was being tracked or monitored by unknown sources.  To assuage plaintiff's concerns, Rodgers arranged for the WTCSB IT department to do a security scrub of plaintiff's computer and to get plaintiff a new phone. (Ex. 16, Rodgers Dep., pp. 18-19; Ex. 13, Rodgers Aff.)

16.      In the fall of 2019, Mitzi Carpenter, a co-worker on the PDT team, noticed that plaintiff was having trouble staying focused and was exhibiting nervous paranoia. She noticed that his work product began to wax and wane, and there were periods when his productivity would slow down, or when he would just leave a meeting and walk out to go sit in his car. On

one occasion, she was headed to a monthly meeting in Richmond with Shannon Saunders for CSB data management managers, when Mr. Pope called her, upset, panicking, and expressing paranoia. She let Brandon Rodgers, their supervisor, know that plaintiff was not in a good space and that they would be late for the meeting. Concerned about plaintiff, they brought him with them to Richmond and checked on him throughout the day. On another occasion, at a PDT meeting, Mr. Pope asked those assembled, "do you hear voices?"  Ms. Carpenter suggested that maybe he was hearing voices from a training session in the next room.  Mr. Pope said, "no, no," got up and left the meeting.  (Ex. 17, Carpenter Aff.)

17.     Toward the end of 2019, plaintiff met with Peratsakis and Rodgers and spoke about his being monitored by unknown sources to get through him to his girlfriend and about his concern for her and her child's safety.  Peratsakis suggested that plaintiff speak with a counselor to address situational anxiety and recommended an individual who had attended WTCSB training.  (Ex. 1, Peratsakis Aff.; Ex. 16, Rodgers Aff)

18.     David Hopkins, at that time a Project Manager, shared an office with plaintiff from September 2019 until March 2020.  Twice due to plaintiff's concern that his laptop was compromised, Hopkins and plaintiff compared system folders, files, and running processes on their respective laptops and determined that neither laptop was compromised.  Hopkins also observed that plaintiff became less present in the office and on several occasions turned on the TV to stream a golf tournament.  Plaintiff also began to work in various conference rooms with the lights off, and started skipping PDT meetings, or showing up and/or leaving at random times. (Ex. 18, Hopkins Aff.)

19.     Plaintiff's performance difficulties continued through the end of 2019.   His attendance remained sporadic, he refused to use KRONOS, and he failed to follow protocols to request leave or to document his time.  (Ex. 13, Rodgers Aff.)

20.     On January 7, 2020, Rodgers prepared an *Employee Performance Concern Notification* noting plaintiff's "tardiness/leave or time misuse:"

> on 11/26 and again on 12/13 Mr. Pope was counseled regarding proper use of leave and the need to notify his supervisor when taking leave or altering his schedule. On 1/6/20, Mr. Pope arrived late for work and could not be located by his Supervisor. He failed to respond to a text or email regarding his whereabouts.

(Ex 19, Employee Performance Concern Notification)

21.     In March 2020, the WTCSB issued a COVID Emergency, Furlough and Reduction in Force Policy, "in order to maximize its responsiveness to patient care, employee safety, and service operations."  The  "Emergency Protocols" superseded all agency policies and procedures and, *inter alia*, noted that agency policy obligated affected employees to accept reassignment.  (Ex. 20, COVID Policy)

22.     The WTCSB's paramount need was to ensure coverage for its residential/direct care programs.  As Peratsakis testified, "When COVID struck, we had unprecedented workforce shortages because groups of people would be out from some of our most critical care programs … and the problem that naturally created is not being able to actually hire somebody for such a short period time, so we redeployed staff."  A redeployment committee, comprised of Peratsakis, HR Director Lara Matthews, Finance Director Andrew Jurewitz, Residential Services Director Debbie Dashiell, and Operations Director Rodgers, redeployed numerous employees, including many administrative employees who, like plaintiff, had counseling expertise, to ensure the needed coverage.   On April 15, 2020, plaintiff, a clinician and QMHP by training and experienced in direct clinical services with children, was temporarily redeployed one day per

week, representing 20% of his time, to the Children's Crisis Stabilization Unit.  Plaintiff received the same pay and his administrative responsibilities were appropriately adjusted.    (Ex. 1, Peratsakis Aff.; Ex. 21, Peratsakis Dep., pp. 27-34)

23.     In April 2020, Rodgers sought to meet with plaintiff to address performance issues he observed and those brought to his attention by other management staff.  Despite repeated requests, plaintiff would not meet with or respond to Rodgers as his supervisor to address these issues. Peratsakis advised that plaintiff had "no choice but to meet with his immediate supervisor as requested," and that "[f]ailure to do so is not acceptable and technically is considered insubordination."  Peratsakis also told plaintiff that, "[w]e have a lot of jobs we're working to save.  If you're not happy and want to swap out to something else then that may be an option, but until then I need you to work it out." (Ex.22, 4/18/20 Peratsakis email; Ex. 13, Rodgers Aff.)

24.     On April 21, 2020, Rodgers issued a Group I Written Notice pursuant to the WTCSB's Standards of Conduct., Policy 7.2, noting that on April 17 and 20, plaintiff was "asked to meet with his direct supervisor (Director of Operations) by both his Supervisor and the Executive Director to review project performance and concerns raised by other members of management. Despite multiple prompts, education regarding his responsibilities as an employee, and multiple attempts to engage him, Mr. Pope refused to meet as requested."  Plaintiff's behavior was considered a First Group Offense, "unacceptable conduct to include excessive negativity, bantering or unconstructive criticism and undermining team cohesion or support for the team leader or administration."  He was suspended for one day without pay, and reinstated on April 22, 2020.  (Ex. 13, Rodgers Aff.; Ex.23, Group I Written Notice; Ex. 24, Reinstatement)

25.     On  May 7, 2020, following plaintiff's request, the Redeployment Committee returned plaintiff full-time to his position as an Information Systems Specialist and to the PDT; the increase in the use of telemedicine, and the Zoom and Teams platforms made for additional work in his sphere. (Ex. 2, Pope Position Summary; Ex. 13, Rodgers Aff.)

26.     In response to plaintiff's suspension, plaintiff and Rodgers discussed formalizing their weekly supervisory meetings and plaintiff's request for a full written summary of each meeting.[1] Because plaintiff requested concrete feedback on his performance, Rodgers completed an interim Performance Evaluation for 10/1/19-5/17/20. Noting plaintiff's technical competence, Rodgers outlined multiple "Areas of Performance Concern," including "difficulty in completing tasks as assigned," "difficulty in accepting supervisory feedback and redirection," that he "required continuous monitoring to ensure that work is completed as directed," and that plaintiff is "argumentative when assignments or deadlines are scheduled." (Ex. 25, 5/17/20 Evaluation; Ex. 13, Rodgers Aff)

27.     Rodgers also completed a Performance Enhancement Plan ("PEP") outlining three deficiencies: difficulty completing tasks assigned; difficulty accepting supervisory feedback and redirection; and independent work and completion of tasks. Rodgers outlined steps for improvement, and a July 19, 2020 correction completion date.  (Ex. 26, 5/17/20 PEP)

28.     In early June 2020, Peratsakis and Rodgers restructured the Operations Division's reporting structure, reducing Rodgers' direct reports to allow him to focus on business development.  At the same time, Hopkins was offered his former position as the Information Systems Manager, under Rodgers' supervision. Hopkins earned an AA in Applied Science

---

[1] Contrary to plaintiff's suggestion in his deposition, the discussion about formalizing supervisory meetings and requesting written summaries of meetings was not a request for an ADA accommodation. Pope admitted that he did not tell Rodgers or Peratsakis that he was requesting an accommodation for ADHD.  Ex.3, Johnny Pope Dep., pp. 10-12.  Further, Rodgers did not learn of plaintiff's ADHD diagnosis until this lawsuit was filed. Ex. 13, Rodgers Aff.

majoring in Information Systems in 1997, certification from Novell Netware as an engineer, multiple IT certifications from Microsoft and Cisco and other industry groups, and worked as a network engineer. From 2002-16 Hopkins was the WTCSB Information Systems Manager. After three years as a military contractor, Hopkins returned to the WTCSB in 2019 as a Project Manager. Hopkins' years of work and educational experience in information systems allowed WTCSB to meet the information systems demand resulting from COVID and the agency's transition to a primarily telehealth treatment environment, and also allowed him to reclaim responsibilities that had been outsourced during his absence. (Ex. 1, Peratsakis Aff.; Ex. 18, Hopkins Aff.)

29.     Due to the restructuring and Rodgers' difficulties supervising plaintiff, Peratsakis assigned Hopkins as plaintiff's supervisor as of June 20, 2020. Plaintiff remained in his position as Information Systems Specialist, at the same grade and pay. (Ex.1, Peratsakis Aff)

30.     With plaintiff's PEP still in effect, Hopkins began weekly supervisory meetings with plaintiff and after each meeting provided him with a summary of their meeting and expectations. Plaintiff's responses to Hopkins were disrespectful and unprofessional and included memes, such as "Fake News,' and screenshots of word definitions insinuating negative messages. (Ex.18 Hopkins Aff.; Ex.27 Emails; Ex. 28 Hopkins Dep., p. 11)

31.     On July 17, 2020, Hopkins completed plaintiff's Performance Evaluation for the period 5/19/20 – 7/17/20, the expected PEP completion date. Hopkins noted that plaintiff continued to have "difficulty accepting supervisory feedback and redirection," and that plaintiff "insinuates that he disagrees with supervisory notes by sending pictures, but does not provide specifics or constructive details." Hopkins determined that plaintiff "needs to more readily

accept constructive guidance or information on ways to improve communication and professional development." (Ex. 29, 7/17/20 Evaluation)

32.    Hopkins extended the PEP, documenting plaintiff's improvement in two areas, but indicating plaintiff's continued difficulty in accepting supervisory feedback and redirection. The correction date for this deficiency was set for September 30, 2020 and Hopkins referred plaintiff to the WTCSB's Employee Assistance Program ("EAP"), per WTCSB Policy 7.11. (Ex. 30, 7/17/20 PEP)

33.    Policy 7.11.1, provides that:

> Satisfactory work performance by all employees is essential to the orderly and adequate delivery of services to clients of Western Tidewater Community Services Board. In the interest of employees, their families, the Board, the governmental jurisdictions, and the citizens who become services recipients, WTCSB has established an "Employee Assistance Program" (EAP).
>
> The implementation of the EAP is not intended to supersede regular human resources procedures in dealing with work performance problems and actions. Rather, the EAP is intended to help both the supervisor and employee to determine whether or not declining work performance is being caused by a personal problem, which can be treated. The intent is to improve productivity and to retain and rehabilitate valued employees who might otherwise be lost from the staff of the Western Tidewater Community Services Board.

(Ex. 31, Policy 7.11.1)

34.    Policy 7.11.2, Principles of the Program, provides in pertinent part that:

> G.      The EAP will be applicable to all regular salaried employees.  It is the employee's responsibility to make reasonable effort to restore work performance levels and to take advantage of opportunities to resolve any problems which may have been causative to inadequate work level.
>
> H.      An employee who fails to act responsibly to improve work performance and who refuses the use of the EAP, and whose work performance continues to be unacceptable will be dealt with in accordance with standard administrative and disciplinary policies as provided by Western Tidewater Community Services Board.

(Ex.31, Policy 7.11.2)

35.     Hopkins' EAP referral identified "ineffective communication," and plaintiff's need to:

> communicate in an effective and productive manner that promotes his professional development. Mr. Pope will provide clarification and details when asked to increase time management skills, and he will avoid sending screenshots, memes, and pictures of word definitions that insinuate a message. Insinuation through specific memes, or copy and pasted definitions does not contribute to constructive conversation with regards to how his supervisor can best support him nor clarify his understanding of specific performance deficits he is being cited for.

(Ex. 32, EAP Referral)

36.     In response to plaintiff's queries, Hopkins informed plaintiff that the EAP referral was a directive and not his choice and that ongoing refusal could result in further disciplinary action, including termination. Nevertheless, plaintiff failed to schedule an EAP appointment. (Ex. 18, Hopkins Aff.; Ex. 33, Hopkins email)

37.     On August 4, 2020, plaintiff met with HR Director Matthews and Hopkins to discuss the EAP referral, which plaintiff signed. (Ex.18, Hopkins Aff.; Ex. 32, EAP Referral)

38.     On August 14, 2020, Hopkins emailed plaintiff:

> I have not heard from you regarding the scheduling of your EAP sessions, and the EAP Clinical Manager reports that you have not contacted their office. I have attached a Group 2 write up to this message for failure to follow supervisory instruction to schedule your initial EAP appointment by the given deadline of 10am on 8/12/20. I will be sending a Teams invitation to meet on Monday, 8/17/20 at 10am to review and sign the Group 2 Written Notice with Human Resources.

(Ex. 34, 8/14/20 Hopkins email)

39.     The August 17, 2020 Group II Written Notice identified plaintiff's offense under Standards of Conduct Policy 7.2.2, "Failure to follow supervisor's instructions and noncompliance with supervisor's work related instruction or directive," and detailed that:

on 7/30/2020 Mr. Pope was notified by his supervisor that he would be required to attend mandatory EAP sessions to assist with deficiencies in his existing Plan of Correction – which cited a need for immediate performance improvement, including the following areas: 1) Positive and supportive of management and administrative decisions and policies. 2) Demeanor, behavior, attire and interactions are appropriate to workplace situations and circumstances of activities.

Mr. Pope was notified that given continued challenges in improving these areas that the EAP sessions were not optional. He was asked to schedule his initial EAP appointment by a deadline of 10am on 8/12/2020. Mr. Pope refused to contact the EAP office, failing to comply with a directive put in place to provide remedial assistance in resolving the aforementioned deficiencies. Mr. Pope is in violation of WTCSB Standards of Conduct, Second Group Offense 7.2.2 Failure to follow supervisor's instructions and noncompliance with supervisor's work related instruction or directive.  While customarily this would be regarded as a Group 3 offense and result in possible termination of employment (Third Group Offense 7.2.3 – Insubordination or refusal to follow work related direction from management staff), a Group 2 Written Notice is issued instead in the hopes that EAP will provide remedial support to help ameliorate the problem. As of August 14, the EAP office had not been contacted. Given this, Mr. Pope is again directed to contact the EAP office within two business days of receipt of this Written Notice to schedule the earliest appointment available and send confirmation of the appointment to his supervisor and the Human Resources department.  Failure to do so will result in additional disciplinary measures up to and including termination.

(Ex. 35, Group II Written Notice)

40.    On August 17, 2020, Hopkins and Matthews met with plaintiff, reviewed the Group II Written Notice, and informed plaintiff that he had until COB on August 19, 2020 to contact the EAP office or risk further disciplinary action. On August 20, 2020, plaintiff signed the Group II Written Notice. (Ex. 18,  Hopkins Aff.; Ex.35, Group II Written Notice)

41.    On August 21, 2020, Hopkins informed plaintiff that because he had not yet scheduled an EAP appointment, effective immediately, he was suspended without pay pending the outcome of a disciplinary hearing. (Ex. 36, Hopkins email 8/21/20; Ex. 37, Peratsakis Letter 8/21/20)

42.     Hopkins prepared a draft Group III Written Offense based on insubordination. However, in lieu of that and additional disciplinary action and possible termination, Peratsakis offered plaintiff a lateral transfer to another program. Peratsakis memorialized the offer on August 27, 2020 and informed plaintiff that he was reinstating plaintiff to work and "circling back to provide [him] with detail on three current vacancies that [he] believe[d] would be of interest to [plaintiff]." Peratsakis further informed plaintiff that each of the three positions, for a Clinician II, "entails a level of responsibility commensurate with [his] current salary and training." Peratsakis asked plaintiff to provide his preference quickly, so that he could start work again on Monday, August 31, 2020, otherwise Peratsakis would assume that the first one on the list was acceptable. Plaintiff failed to respond. (Ex.38, Peratsakis email 8/27/20)

43.     On August 28, 2020, Peratsakis informed plaintiff that, "given the alternatives," he had "elected to reassign [plaintiff] to another department and negate the issuance of a Group III Written Notice." As per his earlier email, Peratsakis assigned plaintiff to the first position on the list, Shift Leader CTH Crisis Stabilization Program. Peratsakis advised plaintiff to report to this position at 10 am on Monday, August 31, 2020, and that his salary and benefits would convey. (Ex.38, Peratsakis email 8/28/20)

44.     Plaintiff did not report for work on August 31, 2020 as directed, or on any day thereafter. (Ex. 1, Peratsakis Aff.)

45.     On September 3, 2020, Peratsakis directed that plaintiff could use accrued leave to cover his absence and that health benefits would remain in place. (Ex. 39, Peratsakis email 9/3/20)

46.     By letter dated October 27, 2020, HR provided FMLA information and requested documentation from plaintiff regarding his absence, noting his leave without pay status and that

he was required to submit payment for health insurance premiums.  Although informed that he had 15 days to respond and that failure to do so could jeopardize his employment, plaintiff did not respond. (Ex. 40, HR Letters)

47.     By letters dated November 12, 2020 and December 8, 2020, the HR Dept. continued to request documentation, enclosed FMLA information, and indicated that plaintiff risked immediate termination if he failed to respond.  HR also informed plaintiff of the balance due for his health insurance and that payment was due on the 5th of each month.  By letter dated January 5, 2020, HR informed plaintiff that his health insurance was terminated as of December 31, 2020 due to lack of payment and that the arrears were due by January 22, 2021. Plaintiff did not respond to any of these requests. (Ex. 40, HR Letters)

48.     By letter dated February 10, 2021, HR notified plaintiff that his employment was terminated as of 5 pm, specifying that the WTCSB "can no longer sustain your employment."

> You have not attended work since August 14, 2020, failed to provide medical documentation, and have not communicated with Human Resources and your immediate supervisor about your anticipated return to work date.  Extensive and on-going failure to maintain regular and consistent work attendance have become an untenable burden for the agency.

(Ex.40, HR Letters)

49.     Mitzi Carpenter, at all relevant times the Electronic Health Record (EHR) Manager, was a member of the PDT during plaintiff's tenure, reported to Rodgers, and worked in the business informatics arena.  Carpenter has a BA in social work and an MSW. Responsible for overseeing the operation of the WTCSB's entire HER and State Reporting, Carpenter had been with the WTCSB for many years, had been a Manager in various programs since 2011, and had managed multiple large projects across the agency, including leading the switch in EHR vendors from AVATAR to Credible in 2016.  Carpenter's technical expertise in regulatory monitoring

and implementation of compliance planning were essential to administering the EHR, a tool used extensively in the WTCSB's need to demonstrate compliance with multiple regulatory bodies and a myriad of regulations. Carpenter was also a member of the Virginia Community Services Board Regulatory Committee. She led PDT meetings in Rodgers' absence, based on her status as a manager and extensive experience in both PDT projects and other agencywide initiatives. Carpenter's salary of $61, 435 was commensurate with her job duties, title, knowledge, skills, and abilities. Carpenter had no disciplinary record. (Ex. 12, 30(b)(6) Dep., pp. 48, 53; Ex. 13, Rodgers Aff.)

50.    Plaintiff's business informatics work and his focus on the PDT, was on data visualization, the website and social media, and on one discrete part of the EHR, the client portal. He lacked Carpenter's training, experience, and extensive regulatory knowledge, all necessary to manage the EHR, including security, policy and procedure development, workflow, and related regulatory and compliance matters.  (Ex.13, Rodgers Aff.; Ex. 12, 30(b)(6) Dep., p. 43).

## II. ARGUMENT

### A.  Summary Judgment Standard

Summary judgment is appropriate in the absence of any genuine issue of material fact. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 255 (1986).  Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, such as where the non-moving party fails to make a sufficient showing on an essential element of the claims on which he bears the burden of proof, the moving party prevails.  *Anderson*, 477 U.S. at 248-49; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  While the court draws all inferences in favor of the non-moving party, speculative assertions will not suffice.  *Ross v. Commc'ns*

*Satellite Corp*., 759 F.2d 355, 364 (4th Cir. 1989).   Under this standard, defendants are entitled to judgment on plaintiff's Title VII and VHRA claims.

### B.  Plaintiff Cannot Establish Discrimination or Retaliation under the ADA

As a threshold matter, plaintiff does not dispute that he never requested a reasonable accommodation.   Ex. 3, Johnny Pope Dep., pp.  10-12.   Further, there is no evidence that the WTCSB regarded plaintiff as disabled. As set forth in their Affidavits, neither of plaintiff's direct supervisors, Rodgers and Hopkins, knew of his ADHD diagnosis until this lawsuit. And despite plaintiff's claim that he had suffered from ADHD his entire life, his mother, Theresa Pope, testified that she had no knowledge that plaintiff suffered from ADHD or anxiety.  *See* Ex.8, Theresa Pope Dep., p. 23.

Even assuming *arguendo* that plaintiff took steps to avail himself of the ADA's protections, he does not qualify under the statute.   The ADA defines "qualified individual" as one "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 212-13 (4th Cir. 1994).  In *Tyndall*, the Fourth Circuit held that "an employee who does not come to work cannot perform any of his job functions, essential or otherwise." *Id*. at 213 (citation omitted).  *See Watson v. Fairfax Cty*., 297 F. Supp. 3d 591, 600-01 (E.D.Va. 2018) (holding plaintiff not a qualified individual because frequent absences precluded performance of essential job functions).

*Collins v. Vernadero Grp., Inc*., No. 3:18cv636, 2019  U.S. Dist. Lexis  108980 (E.D.Va. June 28, 2019), is instructive.   In *Collins*, the plaintiff took a leave of absence for almost a year, and claimed informal contact with her supervisors.   When asked about her health status after 11 months, she failed to provide a return to work date and was terminated.   On these facts, the Court

determined that she was not a "qualified individual" under the ADA "because she did not attend work for nearly one year or otherwise perform the essential functions of her job prior" to her termination. *Id*. at \*11-12 (citing *Tyndall*).

Here, it is undisputed that plaintiff did not work from August 31, 2020 until his termination on February 10, 2021; he never reported to the CTH Crisis Stabilization Program per Peratsakis's directive. Further, for months HR requested medical/FMLA information and documentation and informed plaintiff about the status of his health insurance premiums. Plaintiff never responded to any letter or provided any information about his status, a return to work plan, or even his intention to return to work. For six months, plaintiff did not perform the essential functions of his job. He is not a "qualified individual" entitled to ADA protection.

Finally, assuming for argument's sake that plaintiff had asked for a reasonable accommodation and is a "qualified individual," he cannot support a discriminatory discharge claim. Plaintiff failed to meet the WTCSB's legitimate expectations and his termination does not raise a reasonable inference of unlawful discrimination. To establish a *prima facie* case of discrimination under the ADA, plaintiff must demonstrate that (1) he falls within the ADA's protected class; (2) his employer discharged him; "(3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and, (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Haulbrook. v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001).

With regard to the third prong, plaintiff cannot establish that on February 10, 2021, he was meeting the WTCSB's "legitimate expectations." By then, plaintiff had been absent for six months and failed to communicate in any manner. *See Collins*, 2019 U.S. Dist. LEXIS 108980, at \*13 (holding a "[r]egular and reliable level of attendance is an essential function of one's

job.") (citing *Hanna P. v. Coats*, 916 F.3d 327, 334, 339 (4th Cir. 2019)).   Even prior to plaintiff's unilateral decision to stop work, he failed to meet legitimate expectations.  Plaintiff received a Group II Written Notice and an EAP Referral, which he refused to pursue.  He was given the option of a Group III Written Notice and possible termination or the opportunity to choose a lateral position commensurate with his skills and at the same level of pay.  Plaintiff was obligated to abide by the WTCSB's Standards of Conduct and EAP Policy, and by his agreement when hired that he could be transferred laterally at his "current salary," and to a position that "requires job performance consistent with his qualifying education, experience, and credentials." In August 2020, when Peratsakis offered plaintiff a lateral transfer, plaintiff had a B.S. in Psychology, was qualified as a Clinician II/Counselor II, was a Qualified Mental Health Professional, and had years of experience in the WTCSB's clinical programs.  Plaintiff's desire to remain in IT and his unilateral belief that his supervisors' evaluations were "subjective" or "unfair," are considerations irrelevant to whether he met the WTCSB's legitimate expectations. Ex. 3, Johnny Pope Dep., pp. 51, 54.

By the same token, plaintiff's desire to remain in IT does not support a finding that plaintiff was terminated "under circumstances that raise a reasonable inference of unlawful discrimination" or in any way delegitimize his termination.  *Haulbrook*, 252 F.3d at 802.  The WTCSB did not terminate plaintiff's employment because of a purported disability. Plaintiff was terminated because he did not show up for work or communicate with the WTCSB for six months. There is no evidence that non-disabled employees of the WTCSB are permitted to stay away from work for six months, fail to communicate, and remain employed.

Plaintiff's ADA retaliation claim is equally without merit.  To establish a prima facie retaliation claim under the ADA, plaintiff must prove that (1) he engaged in protected conduct,

(2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action. *A Soc'y Without a Name v. Commonwealth of Va.*, 655 F.3d 342, 350 (4th Cir. 2011). As addressed above, plaintiff cannot establish any of the required elements. He never requested an accommodation related to ADHD or any disability and there is no evidence that the WTCSB took adverse action related to such. Even plaintiff's mother disavowed that she knew of his condition.

### C. Plaintiff Cannot Establish Discrimination or Retaliation under Title VII

Plaintiff also alleges gender and race discrimination. To establish a prima facie claim of discrimination based on disparate treatment, plaintiff must establish (1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class. *Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd*, 132 S. Ct. 1327 (2012). Absent direct evidence of discrimination or retaliation, the *McDonnell Douglas* shifting burden paradigm applies in a Title VII claim. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). If plaintiff succeeds in stating a *prima facie* case for discrimination or retaliation, the burden shifts to defendant to articulate legitimate nondiscriminatory reasons for the adverse employment action. Third, to overcome defendant's nondiscriminatory reasons, plaintiff must prove by a preponderance of the evidence that the reasons given were a pretext for discrimination. *Id.* at 802 n.12; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).

In considering the employer's reasons, it is not necessary to determine "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's" adverse employment action. *Hawkins v. Pepsico*, 203 F.3d 274, 279 (4th Cir. 2000)

(citing *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)).  The Fourth Circuit notes that, "this Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *DeJarnette*, 133 F.3d at 299.   Further, the Court recognizes that the employer's perception is critical, *see Hawkins*, 203 F.3d at 280, and "the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization," *Henson v. Liggett Grp., Inc.*, 61 F.3d 270, 277 (4th Cir. 1995).   "[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." *Williams*, 871 F.2d at 456.

At the outset, plaintiff's inability to establish a satisfactory job performance defeats his claim. *See Rayyan v. Va. DOT*, 719 F. App'x 198, 205 (4th Cir. 2018) (holding plaintiff's failure to establish that he was meeting his employer's legitimate performance expectations is, by itself, fatal to a Title VII claim).  When assessing if a plaintiff has met the legitimate expectations of his employer, "it is the perception of the decisionmaker which is relevant, not the self-assessment of the plaintiff." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 518 (4th Cir. 2006) (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)).   A plaintiff's disagreement with an employer's criticisms is not relevant because the inquiry is not whether an employer's assessments of a plaintiff were accurate.   *Hawkins*, 203 F.3d at 279-80.  A plaintiff must "demonstrate that [he] was qualified in the sense that [he] was doing [his] job well enough to rule out the possibility that [he] was fired for inadequate job performance, absolute or relative." *Id*. at 515.  "It is well-established" that job performance is a "valid, non-discriminatory bas[is] for any adverse employment decision." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

Here, the record overwhelmingly reflects plaintiff's failure to meet the WTCSB's legitimate expectations, both in terms of his faltering performance, failure to abide by the Standards of Conduct or expectations set out in the Employee Handbook, and the need to report to work.  Again, plaintiff's belief that his supervisors' assessments were "subjective" or "unfair" is irrelevant.

Next, plaintiff cannot establish an adverse employment action or pretext related to race or gender. Workplace reorganization is permitted if done for legitimate, rather than discriminatory reasons. The decision to restructure Operations and reduce Rodgers' direct reports was a legitimate business decision, as was assigning Hopkins, who became the Information Systems Manager, as plaintiff's supervisor.  This was not a demotion or an adverse action. By the same token, when plaintiff refused the EAP referral, and was offered a lateral move in lieu of a Group III write-up for subordination and possible termination, it was not an adverse action. Plaintiff's preference for remaining in IT and his beliefs that his supervisors' assessments were "subjective" and that the transfer was "unfair," do not convert the WTCSB's legitimate business decisions into unlawful adverse actions.

Further, plaintiff must also point to similarly-situated employees who engaged in the same conduct and were treated differently. "Such a showing would include evidence that the employees dealt with the same supervisor, were subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010).   Under the fourth prong of the *McDonnell-Douglas* burden-shifting framework, "the plaintiff must provide evidence that the proposed comparators are not just similar in *some* respects, but similarly-situated in *all* respects." *Davis v. Town of Tazewell,*

*Virginia*, 834 F. App'x 7, 8 (4th Cir. 2021) (citation and internal quotation marks omitted). Relevant considerations include "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Id.* (internal quotation marks omitted).

Plaintiff cannot establish that he was treated differently than a similarly situated employee based on his race or gender. EHR Manager Carpenter, a Caucasian female, was the other member of the PDT with business informatics skills and responsibilities who was supervised by Rodgers. As evidenced above, Carpenter and plaintiff had vastly different job responsibilities, experience, education, and qualifications.[2] A proven manager with years of experience, Carpenter was responsible for the administration and management of the agency's entire electronic health record, and had the required expertise in regulation and compliance. Plaintiff was assigned discrete tasks that did not require that background, expertise or administrative experience. And unlike plaintiff, Carpenter had no disciplinary record or performance issues. On this record, plaintiff cannot establish a *prima facie* case of race or gender discrimination or that the reasons for the WTCSB's actions vis-à-vis plaintiff were pretextual.

Plaintiff also alleges retaliation under Title VII. To establish a *prima facie* case of retaliation, plaintiff must show that: (1) he engaged in a protected activity; (2) the employer acted adversely against him; and (3) there was a causal connection between the protected activity

---

[2] The fact that plaintiff did not have a formal job description when named Information Systems Specialist does not support his discrimination claim. The Status Reports clearly indicate that plaintiff was responsible for data visualization, social media, the website, and later, grant development and participation in the DMC, and the EHR client portal. Ex.14, Status Reports; Ex. 13, Rodgers Aff. *See Johnson v. Tufton Group,* No. L-99-144  2001 U.S. Dist. LEXIS 2489 (D. Md. Feb. 28., 2001) (holding that while job qualifications were not reduced to writing, they existed and had been addressed, and absence of a formal writing was not evidence of discrimination).

and the asserted adverse action. *Ziskie v. Mineta,* 547 F.3d 220, 229 (4th Cir.2008); *Holland v. Wash. Homes, Inc.,* 487 F.3d 208, 218 (4th Cir. 2007). Employees engage in protected activity when they "complain to their superiors about suspected violations of Title VII." *Bryant v. Aiken Rge'l Med. Ctrs. Inc.*, 333 F.3d 536, 543-44 (4th Cir. 2003). Further, the Supreme Court has imposed a heightened causation standard for retaliation claims. "Title VII retaliation claims must be proved according to traditional principles of but-for causation…. This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Here, there is no evidence that plaintiff complained of race or gender discrimination or filed a grievance or EEO complaint per WTCSB policy or otherwise engaged in protected activity. In fact, plaintiff admits he never told HR he was treated differently because of his race. Ex. 3, Johnny Pope Dep., pp. 55-56. Plaintiff appears to rely on the fact that he simply forwarded to HR Director Matthews emails between him and his supervisor reflecting their difficulties, without any accompanying context or specific complaint, and that he was later told by Peratsakis not to blindly forward emails to HR. Ex. 41, Matthews Dep., pp. 18-20.; Ex. 21, Peratsakis Dep., pp. 40-42. However, none of the emails mention gender or race discrimination or unfair treatment based on gender or race. Ex.42, Matthews Aff. At best, the emails suggest non-protected differences that plaintiff was having with his supervisor, which supports why Peratsakis told him to stop forwarding them to HR and to address the conflict with his supervisor. Ex. 21, Peratsakis Dep., p. 42. Peratsakis never told plaintiff that he could not file a complaint, grievance, or EEO claim of discrimination with HR per WTCSB policy. Ex. 1, Peratsakis Aff. *See Reed v. Innovative Mgmt. Strategists, Inc., No.* DKC-16-2422, 2017 U.S. Dist. LEXIS 6563 (D.Md. Jan. 18, 2017) (dismissing retaliation claim where plaintiff failed to

mention any type of discrimination, raising only non-protected issues such as supervisor being critical of her work ethic and abilities).  *See also Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) (noting that "an employee's complaint constitutes protected activity when the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct."). And while plaintiff claims he felt "uncomfortable" in a PDT meeting where Rodgers addressed the George Floyd incident and asked if anyone wanted to contribute to the discussion, he never said anything to Rodgers or complained of race discrimination following that meeting or at any time.  Ex.3, Johnny Pope Dep., pp. 89-94; Ex. 13, Rodgers Aff.  On this record, plaintiff simply cannot support a retaliation claim: there is no evidence of protected activity, adverse action, or any causal connection between the WTCSB's decisions and plaintiff's unsupported allegations of race or gender discrimination.

In essence, plaintiff's complaint isn't really about ADA or Title VII discrimination or retaliation.  His true lament was revealed at his deposition where, without being able to offer any specific incidents or evidence of race, gender, or disability discrimination, he repeated a hollow refrain: he was not getting along with Hopkins because "I wasn't being treated fairly," Hopkins' assessment was "unfair" because "he didn't even give me any specifics," the EAP referral "wasn't fair," he complained to Peratsakis that "I had not been treated fairly at all," and the transfer "just wasn't fair."  Ex. 3, Johnny Pope Dep., pp. 40, 51, 60, 98, 100.  Unfortunately for plaintiff, he cannot prove discrimination based on his unilateral assessment that things were "unfair."

Distilled down, plaintiff's performance was suffering, he did not want or respect Hopkins as his supervisor, he disagreed with Hopkins' assessment of his performance and communication skills, and he  refused to do what was required of him under the WTCSB's policies to remedy the

situation. Without any basis, and notwithstanding his own conduct, plaintiff believed he had the right to remain in his IT position and ignored his employer's right to effectuate a lateral transfer. Plaintiff then took the further steps of failing to report to work and ignoring all communication from the WTCSB for six months.  Plaintiff's discrimination and retaliation claims are without merit.

### III.  CONCLUSION

For the reasons set forth above, defendant Western Tidewater Community Services Board respectfully requests that the Court enter summary judgment in its favor and dismiss plaintiff's claims, with prejudice.

WESTERN TIDEWATER COMMUNITY
SERVICES BOARD

By: _____/s/_____
                    Of Counsel


Jeff W. Rosen, Esq. VSB No. 22689
Lisa Ehrich, Esq. VSB No. 32205
Jeffrey A. Hunn, Esq., VSB No. 45487
PENDER & COWARD, P.C.
222 Central Park Avenue, Suite 400
Virginia Beach, VA 23462
Phone: (757) 490-6293
Fax:    (757) 497-1914
jrosen@pendercoward.com
lehrich@pendercoward.com
jhunn@pendercoward.com
*Counsel for WTCSB*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of May, 2022, I will electronically file the foregoing ***Memorandum of Law in Support of Motion for Summary Judgment*** with the Clerk of Court using the CM/ECF system which will then send a notification of such filing (NEF) to the following:

Steven B. Wiley, Esq. (VSB #47531)
WILEY LAW OFFICES, PLLC
440 Monticello Avenue, Suite 1817
Norfolk, VA 23510
Phone: (757) 955-8455
Fax:    (757) 319-4089
swiley@wileylawoffices.com
*Counsel for Plaintiff*

                    /s/
Jeff W. Rosen, Esq., VSB #22689
PENDER & COWARD, PC
222 Central Park Avenue
Virginia Beach, VA 23462
Phone: (757) 490-6293
Fax:    (757) 497-1914
jrosen@pendercoward.com
*Counsel for WTCSB*