

FILED

AUG - 8 2022

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

**JOHNNY W. POPE, II,**

> **Plaintiff,**

> **v.**

> **WESTERN TIDEWATER
> COMMUNITY SERVICES BOARD,**

> **Defendant.**

**CIVIL ACTION NO. 2:21-cv-449**

### *MEMORANDUM OPINION AND ORDER*

Before the Court is Defendant Western Tidewater Community Services Board's

("Defendant" or "Western Tidewater") Motion for Summary Judgment pursuant to Federal Rule

of Civil Procedure 56. Def.'s Mot. Summ. J., ECF No. 13. The Court has reviewed the Motion,

accompanying memoranda, and exhibits. Def.'s Mem. Supp. Mot. Summ. J., ECF No. 14

("Def.'s Mem. Supp."); Pl.'s Mem. Opp'n to Def.'s Mot. Summ. J., ECF No. 19 ("Pl.'s Mem.

Opp'n"); Def.'s Reply to Pl.'s Mem. Opp'n to Def.'s Mot. Summ. J., ECF No. 22 ("Def.'s

Reply"). Upon review, the Court finds that a hearing on this Motion is not necessary, and this

matter is ripe for judicial determination. *See* E.D. Va. Loc. Civ. Rule 7(J). For the reasons stated

herein, and in accordance with the Court's Order on June 16, 2022, the Court **FINDS** that

Western Tidewater Community Services Board is entitled to judgment as a matter of law and,

therefore, Defendant's Motion for Summary Judgment is **GRANTED**. *See* Order Grant'g Def.'s

Mot. Summ. J., ECF No. 29.

### I.   PROCEDURAL AND FACTUAL HISTORY

On August 4, 2021, Plaintiff Johnny W. Pope, II, ("Plaintiff" or "Pope") filed a Complaint

against Western Tidewater, alleging four causes of action: (1) Discrimination in Violation of the

1

Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") (¶¶ 30-35); (2) Retaliation in

Violation of the ADA (¶¶ 36-41); (3) Discrimination in Violation of Title VII of the Civil Rights

Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") (¶¶ 42-46); and (4) Retaliation in Violation of

Title VII (¶¶ 47-52). Compl., ECF No. 1. On September 10, 2021, Defendant filed an Answer.

Answer to Compl., ECF No. 8. On May 18, 2022, Defendant filed the instant Motion. Def.'s Mot.

Summ. J. On June 1, 2022, Plaintiff responded in opposition. Pl.'s Mem. Opp'n. On June 6, 2022,

Defendant replied. Def.'s Reply. Accordingly, this matter is ripe for judicial determination. The

following facts are undisputed and viewed in the light most favorable to Plaintiff as the nonmoving

party.[1] *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

   Plaintiff is an African American male and resident of the City of Suffolk, Virginia, who

claims to have been diagnosed with, and receive treatment for, attention-deficit/hyperactivity

disorder (ADHD) and anxiety. Compl. at ¶ 1; Pl.'s Mem. Opp'n at Ex. 2, 4:21-22, 10:16-19 ("Pl.

Dep."); *see also* Def.'s Mem. Supp. at Ex. 3 ("Pl. Dep.").[2] Plaintiff attended Virginia

Commonwealth University (VCU), where he majored in psychology. Pl. Dep. at 8:14-18.

---

[1] Before this Court, the parties must comply with the summary judgment pleading standard set out in Local Civil Rule 56, which states, in pertinent part:

> Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed. A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute. In determining a motion for summary judgment, the Court may assume the facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

E.D. VA. LOC. CIV. R. 56(B). Plaintiff responded to Defendant's list of material facts and disputes, in part, paragraphs 1, 6-10, 16, 18, 23-24, and 42. Pl.'s Mem. Opp'n at 6-7. Accordingly, the facts recited herein derive from Defendant's list of material facts, supported by the record, and Plaintiff's response to those facts, incorporating Plaintiff's disputes where relevant and material.

[2] In support of Plaintiff's contention that he "suffers from, and receives treatment for, [ADHD] and anxiety," he relies only on his deposition, in which he states he has these conditions, and his mother's deposition, in which she states he has these conditions. Pl.'s Mem. Opp'n at 7 (citing Ex. 2 (Pl. Dep.) and Ex. 4 (Theresa Pope Dep.)). Plaintiff does not cite to any medical documentation verifying his diagnoses, but Defendant does not dispute them.

Plaintiff does not recall taking any type of computer course in college, and, since college, has not had any computer training in networking, hardware, or software. *Id.* at 8:19-9:01. He does not have any type of computer certifications in networking, software, or hardware. *Id.* at 9:11-14. At all times relevant to the Complaint, Plaintiff was a Qualified Mental Health Professional ("QMHP"). Def.'s Mem. Supp. at Ex. 4 ("QMHP Certification").

Defendant is an "operating" community services board organized under the laws of the Commonwealth of Virginia, specifically Virginia Code § 37.2-500 *et seq.* Compl. at ¶ 2. Defendant is one of 40 public mental health community service agencies in the Commonwealth of Virginia, serving the cities of Suffolk and Franklin, and the counties of Isle of Wright and Southampton. Pl.'s Mem. Opp'n at Ex. 9, 5:05-07 ("Peratsakis Dep."); Def.'s Mem. Supp. at Ex. 6, at 1, 3 ("Emp. Handbook"). Defendant's mission is to provide a coordinated system of exemplary care in mental health, intellectual disabilities, and substance abuse services to the citizens of the locations they serve. Emp. Handbook at 2. Demetrios Peratsakis is the Executive Director. Def.'s Mem. Supp. at Ex. 1, ¶ 1 ("Peratsakis Aff.").

Peratsakis first hired Plaintiff on July 6, 2005, as an hourly Program Assistant. Def.'s Mem. Supp. at Ex. 2 ("Pl. Position Summ."). From March 2014 through August 2014, Plaintiff served as a Program Technician. *Id.* In August 2014, following part-time roles with Defendant over the summers and one school semester, Plaintiff applied for and was hired as a Program Technician in a residential program with the title of Clinician I/Counselor I. *Id.* In May 2015, Plaintiff became a Clinician II/Counselor II. *Id.* In accepting employment with Defendant in 2014, Plaintiff agreed that Defendant "has the right, at any time, to effect a lateral transfer of me/my position." Def.'s Mem. Supp. at Ex. 5 ("Agreems. & Certs."). Defendant defined "lateral transfer" as "a change in job assignment, responsibilities and/or classification that retains at least

my current salary level and requires job performance consistent with my qualifying education, experience, and credentials." *Id.* Plaintiff also received the Western Tidewater Employee Handbook, which addresses, *inter alia*, employment expectations, timekeeping, standards of conduct, attendance and punctuality, and communications. *See* Emp. Handbook. The Handbook establishes that "[e]mployees are expected to record their time via the KRONOS Workforce Ready Mobile App or on their desktop/laptop." *Id.* at 4. Plaintiff was also subject to all of Defendant's policies, including Policy 7.2, Standards of Conduct. Def.'s Mem. Supp. at Ex. 7 ("Policy 7.2"). The Standards of Conduct include Defendant's disciplinary procedure and "serves as a guide to the professional behavior and proper business practices." *Id.* at 1.

Plaintiff's mother, Theresa Jackson Pope, has worked at Western Tidewater for almost 38 years. Pl.'s Mem. Opp'n at Ex. 19, 6:07-11 ("Theresa Pope Dep."). She currently serves as a clinical administrator, in which she supervises five teams of supervisors, managers, case managers, clinicians, and outpatient individuals. *Id.* at 6:14-22. Ms. Pope also served on the leadership team alongside Mr. Peratsakis. *Id.* at 17:23-18:05. Ms. Pope's late son, Chad Pope, was a client of Western Tidewater prior to his death and the agency has a building named for him. Peratsakis Aff. at ¶ 4. Given this history, Peratsakis mentored Plaintiff at one point in time and promoted his professional development. *Id.*; *see also* Pl. Dep. at 4:16-24.

For a number of years, Plaintiff's lack of accountability and response to constructive criticism led to conflicts with multiple supervisors and to Peratsakis making periodic changes in Plaintiff's assignment to find a good fit. Peratsakis Aff. at ¶ 5. In July 2017, Plaintiff was moved to Prevention Services as a Program Specialist. Pl. Position Summ. In December 2017, Plaintiff was reassigned as Clinical Team Lead in Court Services under the supervision of Latril Mariano. *Id.* During that time, Mariano had various concerns regarding Plaintiff's work performance,

4

including his attendance, timekeeping, communication, being argumentative, and refusing to follow directions. Def.'s Mem. Supp. at Ex. 10 ("Mariano Memo").

On March 5, 2018, Peratsakis reassigned Plaintiff from a clinician role to the position of Administrative Specialist under the supervision of Brandon Rodgers, the Director of Operations. Peratsakis Aff. at ¶ 7; Pl. Position Summ. Plaintiff's grade and pay remained the same. Peratsakis Aff. at ¶ 7. Plaintiff was assigned to the Program Development Team ("PDT") that Mr. Rodgers oversaw. *Id.* The PDT, first assembled in late 2014 or early 2015, was responsible for grants, and new program incubation and launch. *Id.* at ¶ 8. The PDT was composed of employees with relevant skillsets from across the agency, including human resources, licensing regulations, documentation management and quality assurance, financial regulation, electronic health records, and clinical guidance. *Id.* Members of the PDT had different supervisors based on their positions in the agency. *Id.* Some members had ongoing responsibilities factoring into many of the PDT's projects, while others were brought on as needed for specific projects. *Id.*; *see also* Def.'s Mem. Supp. at Ex. 12, 40:04-42:15 ("Rodgers Dep.").

Plaintiff worked in business informatics and was tasked with data visualization and management of Defendant's social media and website. Def.'s Mem. Supp. at Ex. 13, ¶ 5 ("Rodgers Aff."). Plaintiff became adept at business informatics, including developing an expertise in business intelligence reporting in the electronic health record. *Id.* at ¶ 6. In November 2018, Defendant sent Plaintiff to a multi-day off-site training in Rockville, Maryland. *Id.* On October 22, 2018, Plaintiff received a salary increase from $38,000 to $41,000, and his position title changed from Administrative Specialist to Information System Specialist. *Id.* at Ex. 14, 2 ("Pl. Status Report"). On May 6, 2019, Plaintiff received another salary increase from $41,000 to $44,000. *Id.* at 1. In addition to his raise, Rodgers assigned Plaintiff additional duties,

including grant development and participation in a state-wide CSB Management Committee that Rodgers chaired. Rodgers Aff. at ¶ 8. Throughout the remainder of 2018 and into 2019, Rodgers had supervisory meetings with Plaintiff, per Defendant's Policy 6.1.1, Performance Planning and Evaluation. *Id.* at ¶ 9; *see also* Def.'s Mem. Supp. at Ex. 15 ("Policy 6.1.1"). Rodgers also had informal contact with Plaintiff on an almost daily basis, whether in person or through emails, texts, or calls. Rodgers Aff. at ¶ 9. The PDT also had regular meetings at a set time and place, which all members, including Plaintiff, were expected to attend. *Id.* at ¶ 10.

As 2019 progressed, in around August or September, Plaintiff's performance began to suffer. *Id.* at ¶ 11; Rodgers Dep. at 11:21-25. Rodgers received numerous reports from Plaintiff's co-workers about his behavior in meetings and contributions to team assignments. Rodgers Aff. at ¶ 11. Plaintiff failed to accept responsibility for incomplete work or missed assignments and, in a matter of months, his attendance went from excellent to sporadic. *Id.* Plaintiff also refused to document his time through KRONOS or his project logs. *Id.* During this time, Rodgers continued to counsel Plaintiff about his behaviors and performance. *Id.* at ¶ 12; Rodgers Dep. at 12:01-12. Later in 2019, Plaintiff expressed to Rodgers a concern that he was being tracked or monitored by unknown sources. Rodgers Aff. at ¶ 12. To assuage his concerns, Rodgers arranged for the IT department to do a security scrub of Plaintiff's computer and to get him a new phone. *Id.*

Mitzi Carpenter was one of Plaintiff's co-workers on the PDT team who also worked in the business informatics area and was assigned roles on some of the same projects as Plaintiff. Def.'s Mem. Supp. at Ex. 17, ¶ 3 ("Carpenter Aff."). In the fall of 2019, Carpenter noticed that Plaintiff was having trouble staying focused and was exhibiting nervous paranoia. *Id.* at ¶ 4. She noticed that his work product began to wax and wane, and there were periods when his productivity would slow down or when he would leave a meeting and walk out to go sit in his

6

car. *Id.* at ¶ 5. On one occasion, Carpenter was headed to a monthly meeting in Richmond with

Shannon Saunders for CSB data management members when Plaintiff called Carpenter, upset,

panicking, and expressing paranoia. *Id.* at ¶ 6. Carpenter let Rodgers know that Plaintiff was not

in a good space and that they would be late for the meeting. *Id.* Concerned about Plaintiff,

Carpenter and Saunders brought Plaintiff with them to Richmond and checked on him

throughout the day. *Id.* On another occasion, in a PDT meeting, Plaintiff asked, "do you hear

voices?" *Id.* at ¶ 7. Carpenter suggested that maybe Plaintiff was hearing a training session that

was happening in the next room, but Plaintiff said "no, no," and got up and left the meeting. *Id.*

Toward the end of 2019, Peratsakis and Rodgers met with Plaintiff, during which

Plaintiff spoke again about his being monitored by unknown sources to get through him to his

girlfriend, and about his concern for her and her child's safety. Rodgers Aff. at ¶ 13; Peratsakis

Aff. at ¶ 10. Peratsakis suggested that Plaintiff speak with a counselor to address situational

anxiety and recommended Chris Parkin, an individual who had attended Western Tidewater

training. Rodgers Aff. at ¶ 13; Peratsakis Aff. at ¶ 10. At this meeting, Plaintiff did not inform

either Rodgers or Peratsakis that he needed an accommodation at work because of his ADHD.

Pl. Dep. at 12:20-13:10. Rather, Plaintiff "said [he] would feel more comfortable communicating

through written correspondence." *Id.* at 14:05-06. Plaintiff stated that he made this request to ask

for support and thinks it is "productive to suggest things that would help you, in the agency or

the business, be more efficient." *Id.* at 14:08-10, 15:08-12. Plaintiff also did not make a formal

request to Defendant to accommodate his disability. *Id.* at 17:08-23.

David Hopkins shared an office with Plaintiff from September 2019 through March 2020.

Def.'s Mem. Supp. at Ex. 18, ¶ 7 ("Hopkins Aff."). At the time, Hopkins held the position as a

Project Manager. *Id.* On two occasions, due to Plaintiff's concern that his laptop was

compromised, Hopkins and Plaintiff compared system folders, files, and ran processes on their respective laptops, determining everything was the same and neither laptop was compromised.[3] *Id.* During that time, Hopkins also observed that Plaintiff became less present in the office, and on several occasions, Plaintiff turned on the TV to stream a golf tournament and then left. *Id.* at ¶ 8. Plaintiff also began to work in various conference rooms with the lights off and started skipping PDT meetings, or showing up and/or leaving at random times. *Id.* at ¶ 9.

Plaintiff's performance difficulties continued through the end of 2019: his attendance remained sporadic, he refused to use KRONOS, and he failed to follow protocols to request leave or to document his time. Rodgers Aff. at ¶ 14. On January 7, 2020, Rodgers prepared an Employee Performance Concern Notification noting Plaintiff's "tardiness/leave or time misuse." *Id.* at ¶ 15. Specifically, Rodgers issued a written supervisory note, which is a written notation documenting the specific performance or conduct deficit addressed with an employee. Def.'s Mem. Supp. at Ex. 19 ("Pl. Perform. Concern Notif."). Rodgers explained that, on two separate occasions, Plaintiff "was counseled regarding proper use of leave and the need to notify his supervisor when taking leave or altering his schedule." *Id.* On January 6, 2020, Plaintiff "arrived late for work and could not be located by his Supervisor," and "[h]e failed to respond to a text or email regarding his whereabouts." *Id.* Accordingly, Rodgers outlined a timeline and plan for improvement that, "[e]ffective immediately, [Plaintiff] will clock in to the agency required time keeping system when on site, [and] notify his Supervisor of any absence or when working away from his primary work location." *Id.* Rodgers also noted that Plaintiff's "compliance w[ould] be reviewed weekly with his Supervisor for the next month." *Id.*

---

[3] Theresa Pope opined that Plaintiff was not appearing paranoid and "[s]omething was going on" with his computer because he showed her "the stuff that was taking up a lot of memory" on it. Theresa Pope Dep. at 40:03-11. The Court notes her opinion for completeness, but finds that it does not contradict Hopkins' perception of events and, thus, does not create a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

In March 2020, Defendant issued a COVID Emergency Redeployment, Furlough and Reduction in Force Policy "in order to maximize its responsiveness to patient care, employee safety and service operations." Def.'s Mem. Supp. at Ex. 20, 1 ("COVID Policy"). This Policy "supersede[d] all other agency policies and procedures unless expressly indicated." *Id.* Further, the Policy explained that, "[i]n consultation with the employee's supervisor and members of the agency management, the Executive Director will identify the particular employee(s) to be redeployed, furloughed or reduced in hours, reduced in force, reduced in pay, or be subject to revised duties or reporting assignments." *Id.* These decisions would be based on applying a combination of criteria, including, *inter alia*: value, benefit, and importance to the agency; personal qualifications; productivity, quality of work, including history of disciplinary action, and prior and current work performance. *Id.* at 1-2. Finally, the Policy noted that "employees are expected to accept redeployment assignments under the terms and conditions stipulated." *Id.* at 2. Failure to do so would subject an employee "to disciplinary action up to and including termination" as well as losing "all protections and rights provided" in the Policy. *Id.*

During the COVID crisis, Defendant's paramount need was to ensure coverage for its residential and direct care programs. Peratsakis Aff. at ¶ 11. Defendant "had unprecedented workforce shortages because groups of people would be out from some of [their] most critical care programs," typically for 14 days. Peratsakis Dep. at 28:08-12. Because Defendant could not hire someone for such a short period of time, they redeployed staff. *Id.* at 28:13-15. A redeployment committee, composed of Peratsakis, HR Director Lara Matthews, Rodgers, and others, redeployed numerous employees, including many administrative employees who had counseling expertise to ensure the needed coverage. Peratsakis Aff. at ¶ 11. On April 15, 2020, Plaintiff, who was a clinician and QMHP by training with experience in direct clinical services

with children, was temporarily redeployed one day per week, representing 20% of his time, to the Children's Crisis Stabilization Unit. *Id.* at ¶ 12. Plaintiff received the same pay, and his administrative responsibilities were appropriately adjusted. *Id.*

In April 2020, Rodgers sought to meet with Plaintiff to address performance issues he observed and those brought to his attention by other management staff.[4] Rodgers Aff. at ¶ 16. On April 17, 2020, Peratsakis sent an email to Plaintiff and Rodgers, in which he told them that he needed them "to work it out and get on the same page." Def.'s Mem. Supp. at Ex. 22 ("Peratsakis Email Apr. 17, 2020"). Peratsakis told Plaintiff that he "ha[d] no choice but to meet with [his] immediate supervisor as requested" and that "[f]ailure to do so is not acceptable and technically is considered insubordination." *Id.* Peratsakis also informed Plaintiff that Rodgers was "traying to run some interference on [his] behalf" because Peratsakis had "gotten and [*sic*] earful of concerns raised by others" and believed that Rodgers was "trying to do some damage control before things g[o]t worse." *Id.* Peratsakis explained that "[i]f others [are] having issues it makes it harder for [him] to rely on [Plaintiff] to get things done." *Id.* Finally, Peratsakis advised Plaintiff that "[w]e have a lot of jobs we[']re working to save" and that if Plaintiff was "not happy and want[ed] to swap out to [*sic*] for something else, then that may be an option, but until then [Peratsakis] need[ed] [Plaintiff] to work it out." *Id.*

On April 21, 2020, Rodgers issued Plaintiff a Group I Written Notice. Def.'s Mem. Supp. at Ex. 23 ("Group I Notice"). Pursuant to Policy 7.2, the purpose of a Written Notice "is to discipline the employee for a clear infraction of stated or established rules and regulations or for failure to properly remedy poor or unacceptable work performance." Policy 7.2 at 6. A first group offense "identif[ies] unacceptable conduct and performance deficiencies that, as individual

---

[4] It is disputed whether Plaintiff responded to Rodgers requests to meet. *Compare* Pl.'s Mem. Opp'n at 7, *with* Def.'s Mem. Supp. at ¶ 23. The Court finds, however, that this disputed fact is immaterial. *Celotex*, 477 U.S. at 323.

incidents or patterns of incidents, are serious and of sufficient severity to warrant corrective, remedial or disciplinary action." *Id.* at 9.

In the Notice, Rodgers explained that on April 17, 2020, and again on April 20, 2020, Plaintiff "was asked to meet with his direct supervisor (Director of Operations) by both his supervisor and the Executive Director to review project performance and concerns raised by other members of management." Group I Notice. "Despite multiple prompts, education regarding his responsibilities as an employee, and multiple attempts to engage him, [Plaintiff] refused to meet as requested."[5] *Id.* Rodgers listed Plaintiff's "unacceptable conduct," in violation of "[Western Tidewater's] Standards of Conduct First Group Offenses 7.2.1," to include "excessive negativity, bantering or unconstructive criticism and undermining team cohesion or support for the team leader or administration." *Id.* Accordingly, Plaintiff was suspended from April 20, 2020, to April 21, 2020, and reinstated on April 22, 2020. *Id.*; *see also* Def.'s Mem. Supp. at Ex. 24 (email chain notifying Plaintiff of written notice and confirming reinstatement). On May 7, 2020, following Plaintiff's request, the COVID Redeployment Committee returned him full-time to his position as an Information System Specialist and to the PDT. Rodgers Aff. at ¶ 19. Plaintiff was needed full-time in his administrative role, as the increase in the agency's use of telemedicine, and the Zoom and Teams platforms, made for additional work in his sphere. *Id.*

In April or May 2020, Plaintiff wrote to Rodgers, requesting "[t]o have regularly scheduled supervisions and to communicate through written correspondence, [and] to be provided meeting agendas." Pl. Dep. at 10:24-11:08. Plaintiff claims that this was a disability accommodation request for his ADHD, but admits he did not tell Rodgers that he was requesting an accommodation. *Compare id.* at 10:16-11:01 (answering affirmatively that he actually made a

---

[5] *Id.*

11

request for an accommodation for his ADHD to Rodgers), *with id.* at 11:11-13 (answering

negatively that he actually told Rodgers this request was an accommodation for his ADHD).

In response to Plaintiff's suspension, Rodgers met with him to discuss formalizing their

weekly supervisory meetings and to discuss his request for a full written summary of each

meeting. Rodgers. Aff. at ¶ 20. Because Plaintiff requested concrete feedback on his

performance, Rodgers completed an interim Performance Evaluation for the time period between

October 1, 2019, and May 19, 2020. *Id.* at ¶ 21. In the Evaluation, Rodgers noted that Plaintiff

"continues to demonstrate technical competence in his specialty area of business intelligence

reporting and data visualization." Def.'s Mem. Supp. at Ex. 25, 1 ("Perform. Eval. May 19,

2020"). However, Rodgers also identified multiple areas of performance concern, including

difficulty completing tasks as assigned, difficulty accepting supervisory feedback and

redirection, being argumentative when assignments or deadlines are scheduled, and that Plaintiff

required continuous monitoring to ensure that work is completed as directed. *Id.* Rodgers also

completed a Performance Enhancement Plan ("PEP"), wherein he outlined Plaintiff's

performance difficulties and a corrective action plan with a July 19, 2020, completion date.

Rodgers Aff. at ¶ 21; *see also* Def.'s Mem. Supp. at Ex. 26 ("PEP May 19, 2020").

In early June 2020, Peratsakis and Rodgers restructured the Operations Division's

reporting structure, reducing Rodgers' direct reports to allow him to focus on business

development. Rodgers Aff. at ¶ 22; Peratsakis Aff. at ¶ 13. At the same time, Hopkins was

named to his former position with Western Tidewater as Information Systems Manager and

became Plaintiff's direct supervisor. Rodgers Aff. at ¶ 22; Peratsakis Aff. at ¶ 13. Hopkins

reported to Rodgers. Rodgers Aff. at ¶ 22; Peratsakis Aff. at ¶ 13. Hopkins earned an associate

degree in Applied Science, majoring in Information Systems in 1997, earned his certification as

an engineer from Novell Netware, has multiple IT certifications from Microsoft and Cisco, among other industry groups, and has worked as a network engineer. Hopkins Aff. at ¶ 3. From 2002 to 2016, Hopkins was employed as Western Tidewater's Information Systems Manager. *Id.* at ¶ 4. From 2016 to 2019, he worked as a military contractor. *Id.* at ¶ 5. In late 2019, Hopkins returned to Western Tidewater as a Project Manager, focusing on information technology, and, in June 2020, he was named to his former position as Information Systems Manager. *Id.* at ¶ 6. According to Peratsakis, Hopkins' years of work and educational experience in information systems allowed Defendant to meet the information systems demand resulting from COVID and the agency's transition to a primarily-telehealth treatment environment. Peratsakis Aff. at ¶ 14.

Due to the restructuring and Rodgers' difficulties supervising Plaintiff, Peratsakis assigned Hopkins as Plaintiff's supervisor as of June 20, 2020. *Id.* at ¶ 15. Plaintiff remained in the same position as Information Systems Specialist, with the same grade and pay. *Id.* With Plaintiff's PEP still in effect, Hopkins began weekly supervisory meetings with Plaintiff, providing him with a summary of their meeting and expectations each time afterward. Hopkins Aff. at ¶ 10. Hopkins considered Plaintiff's responses to him to be disrespectful and unprofessional, including memes such as "Fake News" and screenshots of word definitions to insinuate negative messages. *Id.* at ¶ 11; Def.'s Mem. Supp. at Ex. 27 ("Pl. & Hopkins Emails").

For instance, on June 29, 2020, Hopkins sent Plaintiff an email summarizing their weekly supervisory meeting on June 22, 2020. Pl. & Hopkins Emails at 3-4. In the summary, Hopkins noted that, during their discussion about the goals and vision for the IT Department, Plaintiff "stated that the whole situation was 'odd' and that he wanted to know what his role was in this." *Id.* at 3. After Hopkins explained Plaintiff's responsibilities, he asked Plaintiff what he meant by "odd" and whether that referred to the organizational restructure and reporting to Hopkins. *Id.*

13

Plaintiff "explained that he brought more to the team than others and thought we should be peers." *Id.* In response to receiving the meeting summary, Plaintiff wrote that he had "explained that it's 'odd' to now be designated as your lesser; when considering my skill level, ongoing tenure, and successful execution of a multitude of tasks for which we've both been responsible for." *Id.* at 2. Plaintiff went on to say that "[s]haring of knowledge/expertise will be reciprocal. Skill level/Expertise is very different from a level of familiarity with previous IT specific policies and/or procedures that were in place." *Id.* at 3. Plaintiff concluded the email by listing areas in which he states he was "currently more knowledgeable." *Id.* On July 2, 2020, Hopkins sent Plaintiff a list of current tasks he was working on, and, in response, Plaintiff included a screenshot of the dictionary definition of "sensationalism" and a picture of a computer keyboard key that stated, "weekly fake news." *Id.* at 1-2.

On July 17, 2020, Hopkins completed Plaintiff's performance evaluation for the time period between May 19, 2020, and July 17, 2020. Def.'s Mem. Supp. at Ex. 29, 1 ("July 17, 2020, Perform. Eval."). Hopkins noted that Plaintiff continued to have "[d]ifficulty accepting supervisory feedback and redirection." *Id.* Moreover, he noted that Plaintiff "insinuates that he disagrees with supervisory notes by sending pictures, but does not provide specifics or constructive details." *Id.* Hopkins concluded that Plaintiff "needs to more readily accept corrective guidance or information on ways to improve communication and professional development." *Id.* Hopkins therefore extended Plaintiff's PEP to September 30, 2020, for Plaintiff to continue working on accepting supervisory feedback and redirection. Hopkins Aff. at ¶ 12; Def.'s Mem. Supp. at Ex. 30 ("July 17, 2020, PEP").

On August 4, 2020, Hopkins referred Plaintiff to Defendant's Employee Assistance Program ("EAP"), pursuant to Defendant's Policy 7.11, for ineffective communication. Def.'s

Mem. Supp. at Ex. 32 ("EAP Referral"); *see* Def.'s Mem. Supp. at Ex. 31 ("EAP Policy"). That same day, Hopkins and HR Director Matthews reviewed the EAP referral with Plaintiff and explained that the next step was to call and schedule his initial session. Def.'s Mem. Supp. at Ex. 33, 2 ("Aug. 12-13, 2020, Emails"). On August 6, 2020, Hopkins sent Plaintiff current EAP literature and offered to call the EAP office with him. *Id.* On August 7, 2020, Hopkins asked Plaintiff for an update on scheduling his EAP sessions and did not receive a response. *Id.* On August 9, 2020, Hopkins received an email message from a colleague referencing concerns about Plaintiff's actions in a group meeting. *Id.* On August 10, 2020, Hopkins gave Plaintiff a deadline of August 12, 2020, at 10:00 a.m. to call the EAP office and schedule his appointment. *Id.* Plaintiff asked Hopkins what the ramifications were if he refused to proceed with the EAP, to which Hopkins replied that Plaintiff's referral and contacting the office was a directive and not optional. *Id.* On August 12, 2020, at 11:30 a.m., Hopkins received a notification from the EAP Clinical Manager that his office had not heard from Plaintiff. *Id.* Hopkins then asked Plaintiff via email for an update and did not receive a response. *Id.*

On August 14, 2020, Hopkins emailed Plaintiff regarding the EAP directive and Plaintiff's failure to schedule his EAP sessions. Def.'s Mem. Supp. at Ex. 34, 1-2 ("Aug. 14-17, 2020, Emails"). Hopkins served Plaintiff with a Group II Written Notice, pursuant to Policy 7.2.2, for his failure to follow his supervisor's instructions and noncompliance with his supervisor's work-related instruction or directive. Def.'s Mem. Supp. at Ex. 35, 1 ("Group II Notice"). The Notice stated that, "[w]hile customarily this would be regarded as a Group 3 Offense and result in possible termination of employment [pursuant to Policy 7.2.3], a Group 2 Written Notice is issued instead in the hopes that EAP will provide remedial support to help ameliorate the problem." *Id.* The Notice also directed Plaintiff to contact the EAP office within

two business days and send confirmation of the appointment to his supervisor and the HR Department. *Id.* The Notice warned Plaintiff that "[f]ailure to do so will result in additional disciplinary measures up to and including termination." *Id.* On August 17, 2020, Hopkins and Matthews met with Plaintiff, reviewed the Group II Written Notice, and informed Plaintiff that he had until close of business on August 19, 2020, to contact the EAP office. Aug. 14-17 Emails at 1. On August 20, 2020, Plaintiff signed the Group II Notice. Group II Notice at 2.

On August 21, 2020, Hopkins emailed Plaintiff, notifying him that he had received notice from the EAP Clinical Manager that Plaintiff had not contacted their office to schedule his EAP sessions despite several prompts and directives. Def.'s Mem. Supp. at Ex. 36 ("Aug. 21, 2020, Email"). As a result, Hopkins informed Plaintiff that he was suspended without pay for no more than ten consecutive days pending the outcome of a disciplinary hearing. *Id.*; Def.'s Mem. Supp. at Ex. 37 ("Pl. Susp. Letter").

On August 27, 2020, Peratsakis reinstated Plaintiff to work and provided him with details on three vacancies into which Plaintiff could laterally transfer. Def.'s Mem. Supp. at Ex. 38, 1-2 ("Aug. 27-28, 2020, Email"). Peratsakis informed Plaintiff that each position entailed a level of responsibility commensurate with his current salary and training. *Id.* at 2. Peratsakis also asked Plaintiff to inform him if he had a strong preference for one over the other, "otherwise [Peratsakis] w[ould] assume that the first one on the list is acceptable." *Id.* Peratsakis anticipated that Plaintiff would start the new position on August 31, 2020. *Id.* On August 28, 2020, after not receiving a response from Plaintiff, Peratsakis informed him that he would be reassigning Plaintiff to the position of Shift Leader at the CTH Crisis Stabilization program, with his current salary and related benefits fully conveying. *Id.* at 1. Peratsakis noted that, "[g]iven the alternatives, [he had] elected to reassign [Plaintiff] to another department and negate the issuance

of a Group III Written Notice." *Id.* Peratsakis advised Plaintiff to report to work on Monday,

August 31, 2020, at 10:00 a.m. to begin his orientation to the program. *Id.* Plaintiff did not report

to work on August 31, 2020, or on any day thereafter. Peratsakis Aff. at ¶ 16.

On September 3, 2020, Peratsakis confirmed to Matthews that Plaintiff did not show up

for work and did not contact anyone regarding his absence. Def.'s Mem. Supp. at Ex. 39 ("Sept.

3, 2020, Email"). Peratsakis stated that Plaintiff's "personal problems contributed to his poor

work performance and may be the reason for his current absence." *Id.* In light of this, Peratsakis

approved "the continued use of his accrued leave to cover his absence and as a means of

continuing his current health benefits." *Id.*

On October 27, 2020, Defendant's HR Department sent Plaintiff a formal request for

additional documentation regarding his absence because he was "now in a leave without pay

status." Def.'s Mem. Supp. at Ex. 40, 2 ("HR Letters"). HR provided Plaintiff with Family

Medical Leave Act (FMLA) information and documents that Plaintiff's physician would need to

complete to determine Plaintiff's FMLA eligibility. *Id.* HR also notified Plaintiff that failure to

respond in 15 days could jeopardize his employment. *Id.* On November 12, 2020, HR sent

Plaintiff a second formal request for additional documentation regarding his absence. *Id.* at 3.

HR provided Plaintiff with FMLA documents, notified him of his current balance for health

insurance coverage, warned him that his health insurance coverage could terminate if he did not

pay, and advised him that he had to return to work or submit the appropriate FMLA documents

by November 30, 2020, in order to avoid the risk of immediate termination. *Id.* On December 8,

2020, HR sent Plaintiff a third formal request and advised him that he had to return to work or

submit the appropriate FMLA documents by December 21, 2020, in order to avoid the risk of

immediate termination. *Id.* at 4. On January 5, 2021, HR sent Plaintiff a fourth and final formal

request, notified him that his health insurance had been terminated due to lack of payment, and advised him that he must return to work or submit the appropriate FMLA documents to avoid the risk of immediate termination. *Id.* at 5.

On February 10, 2021, HR sent Plaintiff a letter notifying him that his employment with Defendant was terminated. *Id.* at 6. The letter advised Plaintiff that Western Tidewater could "no longer sustain [his] employment" because Plaintiff "ha[d] not attended work since August 14, 2020, failed to provide medical documentation, and ha[d] not communicated with Human Resources and [his] immediate supervisor about [his] anticipated return to work date." *Id.* HR concluded that Plaintiff's "[e]xtensive and on-going failure to maintain regular and consistent work attendance ha[d] become an untenable burden for the agency." *Id.*

## II.   LEGAL STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Rule Civ. Proc. 56(a). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotations omitted). If the moving party makes the requisite showing, their burden is discharged to the nonmoving party, who must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324-25 (internal quotations omitted).

Evidence produced for or against a summary judgment motion must be admissible at trial, but it does not need to be produced in an admissible form. *Id.* at 323–324.

When considering a motion for summary judgment, a court must view the facts—and inferences derived from the facts—in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. The preliminary question for the court is "'whether there is any [evidence] upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'" *Id.* at 251 (quoting *Improvement Co. v. Munson*, 14 Wall. 442, 448 (1872) (emphasis in original)). However, a nonmoving party must offer more than unsupported speculation to withstand summary judgment. *Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411–12 (4th Cir. 1986); *see also Anderson*, 477 U.S. at 249–250 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted). Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may consider the fact undisputed for purposes of the motion." Fed. Rule Civ. Proc. 56(e)(2); *accord* E.D. Va. Loc. Civ. Rule 56(B). Ultimately, there is "no genuine dispute as to any material fact" when a party "fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

### III.    DISCUSSION

#### A. Count One: ADA Discrimination

The ADA prohibits a covered employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring,

19

advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a) (2009) (West). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* at § 12111(8). When evaluating a discrimination claim under the ADA, "consideration shall be given to the employer's judgment as to what functions of a job are essential." *Id.*

Plaintiff alleges that Defendant discriminated against him in violation of the ADA when "Defendant terminated [his] employment and otherwise discriminated against [him] in the terms and conditions of his employment . . . because he suffered from a disability, and for reasons arising from discrimination against [him] on account of that disability." Compl. at ¶¶ 31, 32. Alternatively, Plaintiff alleges that Defendant discriminated against him "because Defendant regarded Plaintiff as suffering from a disability." *Id.* The Court considers separately Defendant's decisions to terminate Plaintiff and alter the terms and conditions of his employment.[6]

   1. ADA Discriminatory Discharge

To establish a prima facie case of wrongful discharge under the ADA, a plaintiff must demonstrate: "(1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001); *accord Reynolds v. Am. Nat. Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012). A plaintiff falls "within the ADA's protected class" if he is "a qualified individual with a disability." *Haulbrook*, 252 F.3d at 702.

---

[6] Defendant has essentially ignored Plaintiff's claim regarding the terms and conditions of his employment. Nonetheless, the Court may grant Defendant's Motion on grounds it did not raise. FED. R. CIV. PROC. 56(f)(2).

A plaintiff may prove disability discrimination "through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting framework." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015) (citing *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 & n.3 (2003)). Under that framework, if the plaintiff establishes a prima facie case, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for termination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). In other words, a plaintiff's disability must be the "but-for" cause of his termination. *Gentry v. E. W. Partners Club Mgmt. Co. Inc.*, 816 F.3d 228, 235 (4th Cir. 2016) (holding the text of the ADA calls for a "but-for" causation standard in analyzing an ADA discrimination claim). Plaintiff does not provide any direct evidence of disability discrimination, so the Court evaluates his claim under the *McDonnell Douglas* burden-shifting framework.[7] *Jacobs*, 780 F.3d at 572.

The parties do not dispute that Plaintiff has a disability and was discharged.[8] *See* Def.'s Mem. Supp. at 18 (disputing that Plaintiff requested an accommodation, that Defendant regarded

---

[7] Indeed, Plaintiff does not provide direct evidence for any of his claims of discrimination and retaliation based on his disability and race, but rather relies on indirect evidence in support. Accordingly, the Court evaluates all four Counts under this burden-shifting framework. *See* discussion *infra* Sections III.A.2, III.B, III.C, III.D.

[8] Because the parties do not dispute Plaintiff's ability status, the Court need not inquire into whether Defendant "regarded him" as having a disability. Rather, the "regarded as" inquiry is only relevant to whether a plaintiff qualifies as disabled under the ADA. *See* 42 U.S.C. § 12102(1) (defining "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment"); *see also Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521–22 (1999) ("[A] person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities."). Moreover, "[t]he fact that an employer is aware of an employee's impairment, without more, is insufficient to demonstrate either that the employer regarded the employee as disabled or that perception caused the adverse employment action." *Haulbrook*, 252 F.3d at 703 (internal quotations omitted). Thus, the factual dispute as to whether Mr. Peratsakis and Mr. Rodgers knew of Plaintiff's diagnoses is nonetheless immaterial because, even if Defendant regarded Plaintiff as disabled, Plaintiff still fails to establish the essential element of a causal connection between that knowledge or regard, assuming it existed at the relevant time, and the decisions to discharge him or

21

him as disabled, and that Rodgers or Hopkins knew he was disabled). Defendant argues, however, that Plaintiff is not a "qualified individual" and that, even if he were, he did not meet Defendant's legitimate expectations and cannot demonstrate circumstances that raise a reasonable inference of unlawful discrimination. Def.'s Mem. Supp. at 18-20.

Plaintiff bears the burden of demonstrating that he is a "qualified individual" by showing that he could "perform the essential functions of [his] job." *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 279 (4th Cir. 2004) (internal citations and quotations omitted). To be "essential," the job function must "bear more than a marginal relationship to the job at issue." *Tyndall v. Nat'l Educ. Centers, Inc. of California*, 31 F.3d 209, 213 (4th Cir. 1994) (internal citations and quotations omitted). "Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee who does not come to work cannot perform *any* of his job functions, essential or otherwise." *Id.* (internal citations and quotations omitted) (emphasis in original). While the Fourth Circuit in 1994 did not anticipate the modern-day prevalence of working from home, the fact remains that "a regular and reliable level of attendance is a necessary element of most jobs," whether physically or virtually. *Id.*

Here, Plaintiff stopped showing up for work after his reassignment to Shift Leader of the CTH Crisis Stabilization program. Aug. 27-28, 2020, Email at 1; Peratsakis Aff. at ¶ 16. Indeed, Plaintiff did not attend work either physically or from home from August 31, 2020, until his termination on February 10, 2021, and did not contact anyone regarding his absence. Peratsakis Aff. at ¶ 16; Sept. 3, 2020, Email. By virtue of failing to attend his job for almost six months, Plaintiff could not perform any of his job functions and is therefore not a qualified individual. *Tyndall*, 31 F.3d at 213.

---

allegedly alter the terms and conditions of his employment. *Id.*; *see Celotex*, 477 U.S. at 322; Pl.'s Mem. Opp'n at 12-13 (discussing the disputed fact of Defendant's knowledge).

22

Even if Plaintiff were a qualified individual, the Court finds that he was nonetheless not meeting his employer's legitimate expectations. *Haulbrook*, 252 F.3d at 702. Setting aside Defendant's legitimate expectations of Plaintiff to attend work and communicate between August 2020 and February 2021, the Court finds that Plaintiff was not meeting expectations beforehand. Indeed, Plaintiff's performance at his job began to suffer about one year prior to his decision to stop attending his job, and thus about a year and a half prior to his termination. Rodgers Aff. at ¶ 9; Rodgers Dep. at 11:21-25. At first, Plaintiff's co-workers made reports to their common supervisor regarding his behavior in meetings, inadequate contributions to team assignments, and sporadic attendance. Rodgers Aff. at ¶ 11. Then, in the beginning of 2020, Plaintiff received an Employee Performance Concern Notification regarding his tardiness and lack of attendance. Pl. Perform. Concern Notif. After the COVID-19 pandemic hit and Plaintiff began to have other issues with his supervisor, on April 21, 2020, he received a Group I Written Notice, identifying his unacceptable conduct and performance deficiencies. Group I Notice. As a result, Plaintiff was suspended from work on April 20, 2020, and reinstated on April 22, 2020. *Id*; *see also* Def.'s Mem. Supp. at Ex. 24. In May 2020, Plaintiff received a Performance Evaluation wherein his supervisor identified multiple areas of performance concern, including difficulty completing tasks as assigned, difficulty accepting supervisory feedback and redirection, being argumentative when assignments or deadlines are scheduled, and that Plaintiff required continuous monitoring to ensure that work was completed as directed. Perform. Eval. May 19, 2020. Plaintiff was therefore given a PEP, wherein he was assigned a corrective action plan to be completed by July 19, 2020. PEP May 19, 2020.

On July 17, 2020, Plaintiff's new supervisor completed a Performance Evaluation in which he noted that Plaintiff continued to have "[d]ifficulty accepting supervisory feedback and

redirection" and therefore extended Plaintiff's PEP to September 30, 2020. July 17, 2020, Perform. Eval.; July 17, 2020, PEP. On August 4, 2020, before the expiration of Plaintiff's PEP, his supervisor referred him to Defendant's EAP for ineffective communication. EAP Referral. After Plaintiff failed to schedule his EAP sessions, his supervisor then served him with a Group II Written Notice for his failure to follow his supervisor's instructions and noncompliance with his supervisor's work-related instruction or directive. Group II Notice. Indeed, while Plaintiff's conduct would customarily "be regarded as a Group 3 Offense and result in possible termination," his supervisor issued a Group II Notice instead to "provide remedial support." *Id.* After again failing to schedule his EAP sessions, Plaintiff was suspended without pay pending the outcome of a disciplinary hearing. Pl. Susp. Letter. After reinstatement, on August 28, 2020, Plaintiff was reassigned to the CTH Crisis Stabilization program, maintaining the same salary and benefits. Aug. 27-28, 2020, Email; Peratsakis Aff. at ¶ 16. Plaintiff was set to start to on August 31, 2020, but never showed up. *Id.*

The Court therefore finds that Plaintiff was not meeting Defendant's legitimate expectations for almost a year and a half before his termination. *Haulbrook*, 252 F.3d at 702. Moreover, Plaintiff has failed to raise any circumstances whatsoever that raise a reasonable inference of unlawful discrimination. *Id.* Rather, Plaintiff relies entirely on the argument that his performance evaluations were "subjective." Pl.'s Mem. Opp'n at 12. The ADA and the Fourth Circuit, however, specifically acknowledge and defer to an employer's "subjectivity" when engaging in a discrimination analysis. *See* 42 U.S.C.A. § 12111(8) ("[C]onsideration shall be given to the employer's judgment as to what functions of a job are essential."); *Elledge v. Lowe's Home Centers, LLC*, 979 F.3d 1004, 1009 (4th Cir. 2020) ("[T]he decision about a position's essential functions belongs, in the first instance, to the employer; it accordingly merits

24

considerable deference from the courts.") (internal quotations omitted).[9] Accordingly, the Court finds Plaintiff has failed to establish a prima facie case of ADA discriminatory discharge.

Even if Plaintiff had established a prima facie case, the Court would nonetheless dismiss this claim because Plaintiff neglects his burden of establishing pretext. *See McDonnell Douglas*, 411 U.S. at 804; *see also Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 258 (4th Cir. 2006) ("Once such a neutral reason is proffered [by the defendant after the plaintiff establishes a prima facie case], the burden reverts to the plaintiff to establish that the employer's non-discriminatory rationale is a pretext for intentional discrimination."). Plaintiff's burden "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. To succeed, a plaintiff may persuade the court "indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804-05).

Defendant claims that "Plaintiff was terminated because he did not show up for work or communicate with the WTCSB for six months." Def.'s Mem. Supp. at 20. In response, Plaintiff proposes that "if a jury finds Mr. Peratsakis' and Mr. Rodgers' testimony to not be credible regarding knowledge of Plaintiff's diagnoses and medications in contrast to that of Mr. Pope and Ms. Jackson-Pope, it is likely that it, as a finder of fact, would find the proffered non-discriminatory reason(s) for adverse employment actions up to and including the ultimate termination to not be credible." Pl.'s Mem. Opp'n at 15. He also argues that, "[a]s much of the alleged communication and feedback issues are in the form of emails from Mr. Pope to

---

[9] Plaintiff alleges, without directly connecting such to any claim, that "Defendant failed and refused to update Plaintiff's job description." Compl. at ¶ 9; *see also* Pl.'s Mem. Opp'n at 18. To the extent Plaintiff's allegation is relevant to his ADA claim, the Fourth Circuit has also recognized that, "[w]hile the ADA identifies a position's written job description as relevant to the employer's judgment on [a job position's essential functions], 42 U.S.C. § 12111(8), it does not posit that description as dispositive." *Elledge*, 979 F.3d at 1009. "Rather, a court performing the essential functions inquiry must consult the full range of evidence bearing on the employer's judgment, including the testimony of senior officials and those familiar with the daily requirements of the job." *Id.*

supervisors and Human Resources, a jury as finder of fact is the only proper trier of whether the language and tone of the email correspondence rises to a level of a legitimate reason." *Id.*

Plaintiff's unsubstantiated hypotheses as to how a jury might interpret or perceive evidence at trial, however, are alone insufficient to meet his burden of demonstrating by a preponderance of the evidence that Defendant's non-discriminatory reasons are, in fact, pretextual. *Burdine*, 450 U.S. at 253; *Ash*, 800 F.2d at 411–12. Moreover, his reliance on the "subjectivity" of the negative feedback he received falls short. *See Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000) ("[Plaintiff's] extensive efforts to rebut [Defendant's] assessment of [his] performance simply do not provide a legally sufficient basis" to establish pretext.). In other words, although Plaintiff summarily claims that Defendant's explanation is "unworthy of credence," he offers no evidence to persuade the Court such that it is plausible that a jury would find he was the victim of intentional discrimination. *Burdine*, 450 U.S. at 256; *see also Price v. Thompson*, 380 F.3d 209, 216 (4th Cir. 2004) (finding that even though "[a] reasonable trier of fact could easily conclude that" the hiring official made a mistake about plaintiff's qualifications, they nonetheless "would be hard-pressed to conclude that this established pretext"). Thus, the Court finds that Plaintiff has failed to meet his burden of establishing a prima facie case for ADA discriminatory discharge and, even if he had, he fails to establish pretext.

2.  ADA Discriminatory Alteration to Terms and Conditions

To establish a claim for disability discrimination in altering the terms and conditions of employment under the ADA, a plaintiff must prove: (1) he has a disability; (2) he is a "qualified individual" for the employment in question; and (3) his employer took an adverse employment action against him because of his disability. *Jacobs*, 780 F.3d at 572. A plaintiff may prove this claim "through direct and indirect evidence or through the *McDonnell Douglas* burden-shifting

framework." *Id.* As mentioned, Defendant does not challenge that Plaintiff has a disability, but contends that he failed to establish the second and third prongs. *See* Def.'s Mem. Supp. at 18-21.

The Court finds that Plaintiff is not a qualified individual for the same reasons previously stated with regard to his wrongful discharge claim. Even assuming, *arguendo*, that Plaintiff is a qualified individual, Plaintiff nonetheless fails to establish the third prong. *Jacobs*, 780 F.3d at 572. Plaintiff alleges that his mandatory referral to the EAP, subsequent suspension, and transfer "are adverse employment actions that directly led to [his] ultimate termination." [10] Pl.'s Mem. Opp'n at 13; *see also* Compl. at ¶ 31. For a discrimination claim, a plaintiff must show that the defendant "took an action that adversely affected employment or altered the conditions of the workplace." *Laird v. Fairfax Cnty., Virginia*, 978 F.3d 887, 893 (4th Cir. 2020) (cleaned up). An adverse employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). In other words, the adverse action "must result in 'some *significant detrimental effect*,' requiring more than a position that is 'less appealing' to the plaintiff." *Laird*, 978 F.3d at 893 (quoting *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007)) (emphasis in original). This claim ultimately requires a fact-specific analysis. *Id.*

---

[10] Plaintiff also mentions the concept of constructive discharge for the first time in his opposition brief. *See* Pl.'s Mem. Opp'n at 13-14. Constructive discharge protects an employee "from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985). Plaintiff does not make a constructive discharge claim in his Complaint and it is undisputed that Plaintiff did not resign, but rather was terminated on February 10, 2021. *See* HR Letters at 6. Even if Plaintiff claims that his decision to stop showing up for work was a constructive discharge, however, the Court finds that his argument fails to establish a prima facie claim. *See Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."). Moreover, the record is devoid of evidence that Defendant attempted to pressure Plaintiff to resign. Rather, the record demonstrates that Defendant went beyond its stated deadlines and protocols to retain Plaintiff as an employee, both before and after he stopped showing up to work. *See* Group II Notice; Aug. 27-28, 2020, Email, at 1; HR Letters. Accordingly, the Court finds any constructive discharge claim to be without merit.

First, Plaintiff has failed to demonstrate that his mandatory referral to an EAP is an adverse employment action because he has not shown that he suffered any significant detrimental effect as a result of the referral alone. *Laird*, 978 F.3d at 893; *see Jensen-Graf v. Chesapeake Employers' Ins. Co.*, 616 F. App'x 596, 598 (4th Cir. 2015) (per curiam). In *Jensen-Graf*, for instance, the Fourth Circuit found that the plaintiff failed to demonstrate placement in a performance improvement program (PIP) was an adverse employment action because she "failed to allege that she received lower pay, was demoted, was passed over for a promotion, failed to receive a bonus, or given significantly different responsibilities because she was placed on the PIP." 616 F. App'x at 598. Not only does Plaintiff make the same critical error, but, the Court notes, he also likely cannot show a detrimental effect from this referral or from the program because he repeatedly refused to participate in it. Aug. 14-17, 2020, Emails; Group II Notice.

Moreover, the record demonstrates that, although Plaintiff's referral to the EAP was mandatory, the purpose of the program was rehabilitative, not punitive. Policy 7.11.1 establishes that the EAP "is intended to help both the supervisor and employee to determine whether or not declining work performance is being caused by a personal problem, which can be treated." EAP Policy at 1. "The intent is to improve productivity and to retain and rehabilitate valued employees who might otherwise be lost from the staff of Western Tidewater Community Services Board." *Id.* Indeed, the only punitive aspect of the program comes from failure to participate in the program and work toward performance enhancement. Specifically, the principles of the program establish that it is "the employee's responsibility to make reasonable efforts to restore work performance levels." *Id.* "An employee who fails to act responsibly to improve work performance and who refuses the use of the EAP, and whose work performance continues to be unacceptable will be dealt with in accordance with standard administrative and

disciplinary policies." *Id.* Thus, any detrimental effect that Plaintiff suffered as a result of his refusal to participate does not render the referral alone to be an adverse employment action.

Second, Plaintiff alleges that Defendant's decision to suspend him without pay for no more than ten consecutive days pending the outcome of a disciplinary hearing is an adverse action. Pl.'s Mem. Opp'n at 13; Pl. Susp. Letter. Although neither Plaintiff nor Defendant directly addresses this, the Court assumes that this decision is an adverse employment action because it "inflicts direct economic harm." *Burlington*, 524 U.S. at 762. Yet, Plaintiff nonetheless omits any effort to establish a causal connection between this action and his disability.[11] The record clearly establishes that Defendant's decision to suspend Plaintiff was a direct result of his repeated refusal to schedule his EAP sessions and participate in the mandatorily referred program. Aug. 14-17, 2020, Emails; Group II Notice (warning Plaintiff that failure to contact the EAP "will result in additional disciplinary measures"); Aug. 21, 2020, Email; Pl. Susp. Letter. Plaintiff ignores this rationale entirely and does not even attempt to link this decision to his disability. Rather, he assumes that he establishes his prima facie case by virtue of concluding that his suspension is an adverse employment action. *See* Pl.'s Mem. Opp'n at 14. In failing to address whether his employer took an adverse employment action against him *because of* his disability, Plaintiff fails to establish a prima facie claim. *Jacobs*, 780 at 572.

Finally, Plaintiff alleges that Defendant's decision to laterally transfer him is an adverse employment action. Pl.'s Mem. Opp'n at 13. As with his claim regarding the mandatory EAP

---

[11] Plaintiff recognizes this element in his opposition paper, but only discusses it with regard to the EAP referral. *See* Pl.'s Mem. Opp'n at 12-13. Because the Court finds that the EAP referral is not an adverse employment action, it need not reach the causal element with regard to that particular decision. Even if the Court were to impute Plaintiff's EAP referral rationale to the two other alleged adverse employment actions, however, it would still find that Plaintiff failed to establish his prima facie case for the same reasons previously mentioned. *See* Pl.'s Mem. Opp'n at 13 ("A reasonable jury can determine that either actual knowledge of Plaintiff's mental health diagnoses and/or Defendant regarding or perceiving Plaintiff as suffering from a mental health-related disability were behind Defendant's adverse employment actions against him."); *see also supra* note 7 (knowledge without more is insufficient to establish causation).

referral, Plaintiff has not shown that he suffered any significant detrimental effect as a result of the transfer alone, which is similarly likely due to the fact that he stopped showing up for work and never actually took on the new position. *Laird*, 978 F.3d at 893. The Fourth Circuit has also made clear that, "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Boone v. Goldin*, 178 F.3d 253, 256–57 (4th Cir. 1999).

Here, Peratsakis provided Plaintiff with three options of vacancies for a lateral transfer, each of which entailed a level of responsibility commensurate with his current salary and training. Aug. 27-28, 2020, Email at 1-2. Peratsakis also asked Plaintiff to inform him if he had a strong preference for one over the other, "otherwise [Peratsakis] w[ould] assume that the first one on the list is acceptable." *Id.* at 2. After Plaintiff failed to respond, Peratsakis assigned Plaintiff to the first position on the list. *Id.* at 1. Moreover, Peratsakis specifically informed Plaintiff that, "[g]iven the alternatives, [he had] elected to reassign [Plaintiff] to another department and negate the issuance of a Group III Written Notice." Aug. 27-28, 2020, Email at 1. In other words, Peratsakis explicitly transferred Plaintiff in order to prevent his termination. Even if this could be considered a "reassignment with significantly different responsibilities," however, Plaintiff again fails to attempt to establish a causal connection between the decision to transfer him and his disability. [12] *Burlington*, 524 U.S. at 761; *Jacobs*, 780 at 572. Accordingly, Plaintiff fails to establish a prima facie case for disability discrimination.

In sum, the Court finds that Defendant is entitled to judgment as a matter of law on Count One with regard to Plaintiff's wrongful discharge claim and his disability discrimination claims

---

[12] *See supra* note 10.

as to Defendant's decision to refer him to an EAP, to suspend him, and to transfer him.

Accordingly, Defendant's Motion for Summary Judgment is **GRANTED** as to Count One.

## B.  Count Two: ADA Retaliation

The ADA's retaliation provision prevents an employer from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C.A. § 12203(a) (West). To establish a prima facie retaliation claim under the ADA, a plaintiff must prove: (1) he "engaged in protected conduct"; (2) he "suffered an adverse action"; and (3) "that a causal link exists between the protected conduct and the adverse action." *A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 350 (4th Cir. 2011); *see also Haulbrook*, 252 F.3d at 706 (applying the three-part test to retaliatory discharge claims under the ADA). A plaintiff may similarly prove ADA retaliation under the *McDonnell Douglas* burden-shifting framework. *Haulbrook*, 252 F.3d at 706. However, "a plaintiff is not required to prove the conduct he opposed was actually an ADA violation[;] [r]ather, he must show he had a 'good faith belief' the conduct violated the ADA." *Reynolds*, 701 F.3d at 154 (quoting *Freilich v. Upper Chesapeake Health*, 313 F.3d 205, 216 (4th Cir. 2002)).

Plaintiff alleges that Defendant retaliated against him for "making workplace complaints regarding discrimination and harassment against him or, alternatively, what Plaintiff reasonably believed to be discrimination and harassment" by "altering the terms and conditions of Plaintiff's employment, requiring mandatory EAP over Plaintiff's objections, and ultimately terminating" him. Compl. at ¶¶ 37, 40. For the reasons stated with Count One, the Court finds that the

31

mandatory EAP referral is not an adverse employment action.[13] Therefore, the Court need only decide whether Defendant retaliated against Plaintiff for making workplace complaints regarding discrimination and harassment by terminating him.[14]

Plaintiff argues that a "reasonable jury could find a causal relationship between [his] emails to Human Resources and the chain of events leading to his formal termination from Mr. Peratsakis' July 20, 2020 email." Pl.'s Mem. Opp'n at 17. Yet, Plaintiff glosses over the context of those emails. Even if Plaintiff reasonably believed that the conduct that he experienced violated the ADA, he still needs to prove that his emails to HR constitute a protected activity. *Reynolds*, 701 F.3d at 154; *A Soc'y Without A Name*, 655 F.3d at 350. Plaintiff misconstrues the relevant standard when he states that an action can be considered a protected activity "[i]f the employee reasonably believes that he was opposing an unlawful employment practice." Pl.'s Mem. Opp'n at 16. In other words, the question is not whether Plaintiff reasonably believed that he was opposing an unlawful employment practice, but rather – assuming he had a reasonable belief regarding the unlawfulness of the conduct – whether he engaged in protected activity by emailing HR. Thus, the reasonable belief standard applies to the conduct Plaintiff faced, not the

---

[13] *See supra* Section III.A.2. Plaintiff fails to specifically mention in his Complaint which terms and conditions Defendant altered and, in his opposition paper, merely mentions – without discussing – the relationship between "his accommodation request and the resulting discipline and negative subjective evaluations leading up to the EAP referral, transfer and ultimate formal discharge." Pl.'s Mem. Opp'n at 17. To the extent that Plaintiff grounds his claims on Defendant's decisions to suspend and transfer him, the Court relies on its previous analysis and finds that these are not adverse employment actions.

[14] The parties also discuss whether Plaintiff made a reasonable accommodation request. *Compare* Def.'s Mem. Supp. at 18-19; *with* Pl.'s Mem. Opp'n at 15-17. However, Plaintiff never mentions nor makes any claim regarding making this request in his Complaint. The only allegation relevant to this inquiry is that "Plaintiff . . . express[ed] to Mr. Rodgers a preference to communicate in writing." Compl. at ¶ 16. Plaintiff's retaliation claim, however, relies solely on making workplace complaints. *Id.* at ¶ 37 ("Defendant discriminated against Plaintiff . . . due to his engagement in protected activity, namely, making workplace complaints regarding discrimination and harassment against him or, alternatively, what Plaintiff reasonably believed to be discrimination and harassment."). Thus, the Court finds any discussion or dispute as to whether Plaintiff made a reasonable accommodation to be irrelevant to his Complaint and, indeed, "tantamount to a constructive amendment." *Faulconer v. Centra Health, Inc.*, 808 F. App'x 148, 155 (4th Cir. 2020) (noting that while "a plaintiff does not have to allege in his complaint every fact on which he will rely at summary judgment," he may not "plead one theory and one set of facts in his complaint, and then proceed to trial on an entirely different theory supported by entirely different facts").

alleged opposition he took. *See E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d 397, 406 (4th Cir. 2005) (Title VII "protects activity in opposition not only to employment actions actually unlawful . . . but also employment actions an employee reasonably believes to be unlawful."); *see also Reynolds*, 701 F.3d at 154 (A plaintiff "must show he had a 'good faith belief' the conduct violated the ADA.").

"Protected activities fall into two distinct categories: participation or opposition." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998) (citing 42 U.S.C.A. § 2000e-3(a)). Plaintiff's allegation that he made "workplace complaints regarding discrimination and harassment against him" falls into the opposition category. Compl. at ¶ 37; *see also Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) ("Employees engage in protected oppositional activity when, inter alia, they complain to their superiors about suspected violations of Title VII.") (internal quotations omitted). The Fourth Circuit "has articulated an expansive view of what constitutes oppositional conduct, recognizing that it 'encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.'" *DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) (quoting *Laughlin*, 149 F.3d at 259). However, an employee's complaint does not constitute protected activity unless "the employer understood, or should have understood, that the plaintiff was opposing discriminatory conduct." *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012) (collecting cases). To determine whether an employer should have understood this, courts must "consider whether the complaint could reasonably have led the employer to understand the nature of the complaint in the context in which it was made." *Id.*

Here, Plaintiff fails to show that he engaged in protected conduct because cannot

demonstrate that he actually communicated his belief. Specifically, Plaintiff claims that he made workplace complaints regarding discrimination and harassment against him by forwarding or copying "various email correspondence between he and Mr. Peratsakis and/or Mr. Rodgers to Lara Matthews," the HR Director. Pl.'s Mem. Opp'n at 3. Yet, "[t]here was no question or concern raised or anything" in Plaintiff's emails to HR; "[t]hey were just forwarded emails." Def.'s Mem. Supp. at Ex. 41, 19:04-05 ("Matthews Dep."). Indeed, after receiving these emails, Matthews then "forwarded them to [her] supervisor and asked for guidance on what [she] was supposed to do with them." *Id.* at 19:02-03. Without providing any reason whatsoever as to why he forwarded his email correspondence to HR, the Court finds that the context in which Plaintiff communicated his complaint could not reasonably have led Defendant to understand its nature. *Burgess*, 466 F. App'x at 282. Accordingly, the Court finds that Defendant has not proved that he engaged in protected activity. Even if this were protected activity, however, Plaintiff has nonetheless failed to establish any causal connection between these emails and his discharge.[15] Rather, "Plaintiff submits that this is a jury question." Pl.'s Mem. Opp'n at 17. Again, Plaintiff misunderstands his burden at summary judgment and fails to offer any argument or proof linking his emails to HR to his termination. *A Soc'y Without A Name*, 655 F.3d at 350.

The Court therefore finds that Plaintiff has failed to establish a prima facie case of ADA retaliation and Defendant is entitled to judgment as a matter of law. Accordingly, Defendant's Motion for Summary Judgment is **GRANTED** as to Count Two.

---

[15] Plaintiff summarily asserts there is a causal connection between his complaints and receiving an email from Peratsakis on July 20, 2020, in which Peratsakis directed Plaintiff to stop circumventing his supervisors by sending information to HR regarding his supervision and to instead follow prescribed pathways for proper redress or remedy. Pl.'s Mem. Opp'n at 17 (referring to Pl.'s Mem. Opp'n at Ex. 11). The Court has confined its retaliation analysis to discharge for reasons previously stated and Plaintiff has made no claim that this singular email constitutes an adverse employment action. Accordingly, the Court finds any claim in this regard to be without merit.

## C. Count Three: Title VII Discrimination

Title VII prohibits an employer from "discharge[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C.A. § 2000e-2(a)(1). To establish a prima facie case of Title VII discrimination, a plaintiff must prove: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Coleman v. Maryland Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010), *aff'd sub nom.* 566 U.S. 30 (2012). The *McDonnell Douglas* burden-shifting framework applies to Title VII discrimination claims. *See Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th Cir. 2005).

Plaintiff alleges that Defendant discriminated against him "with regard his termination, pre-termination discipline/evaluations and terms and conditions of employment . . . due to his race."[16] Compl. at ¶ 43. Plaintiff specifically alleges that Defendant racially discriminated against him with regard to his "compensation, receipt of evaluations/feedback, inclusion in meetings and professional development opportunities." *Id.* Defendant challenges Plaintiff's ability to prove the second and fourth elements in all respects, as well as the third element with regard to Plaintiff's terms and conditions of employment. Def.'s Mem. Supp. at 22-24.

Plaintiff's inability to prove satisfactory job performance renders his claim meritless across the board. *Celotex*, 477 U.S. at 322. As previously discussed in depth, the Court finds that Plaintiff failed to adequately perform his job for at least one year prior to his termination.[17]

---

[16] Although Defendant addresses Plaintiff's allegation of "gender and race discrimination," Plaintiff does not make any claim of gender discrimination in his Complaint nor argue any such claim in his opposing memorandum. *Compare* Def.'s Mem. Supp. at 21, *with* Compl. *and* Pl.'s Mem. Opp'n. Accordingly, the Court declines to consider it. *See supra* note 13.

[17] *See supra* Section III.A.1.

Indeed, Plaintiff does not dispute his unsatisfactory performance, but rather claims that the

formal and informal negative feedback he received "are generally about wholly subjective

matters such as demeanor and feedback." Pl.'s Mem. Opp'n at 17. Yet, Plaintiff's "own naked

opinion, without more, is not enough to establish a prima facie case of [race] discrimination."

*Goldberg v. B. Green & Co.*, 836 F.2d 845, 848 (4th Cir. 1988); *see also Evans v. Techs. Appls.*

*& Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (applying this standard of proof to gender

discrimination claims). Moreover, the record contradicts Plaintiff's assertion that "[a]ny non-

subjective areas listed in the performance enhancement plans were admittedly corrected prior to

EAP referral." Pl.'s Mem. Opp'n at 17. Plaintiff therefore fails to establish this essential element.

Further, even assuming for the sake of argument[18] that all of Defendant's challenged

decisions within this claim are adverse employment actions, Plaintiff is unable to establish that

he received "different treatment from similarly situated employees outside the protected class."

*Coleman*, 626 F.3d at 190. "In evaluating similarly-situated comparators, employees are

similarly situated if they are similar in all relevant respects." *Bateman v. Am. Airlines, Inc.*, 614

F. Supp. 2d 660, 674 (E.D. Va. 2009). Although Plaintiff "is not required as a matter of law to

point to a similarly situated white comparator in order to succeed on a race discrimination

claim," *Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 545 (4th Cir. 2003), he

nonetheless bears the burden of "demonstrate[ing] that similarly situated employees were not

treated equally." *Burdine*, 450 U.S. at 258. To be "similarly situated," the comparators Plaintiff

identifies "must have dealt with the same supervisor, have been subject to the same standards

and have engaged in the same conduct without such differentiating or mitigating circumstances

---

[18] Plaintiff seems to ignore his claims regarding "compensation" and "inclusion in meetings and professional development opportunities," relying instead solely on the evaluations he received. *Compare* Compl. at ¶ 43, *with* Pl.'s Mem. Opp'n at 17-19. The Court cannot properly evaluate neglected claims, but notes that the record seems to contradict, or at least fails to substantiate, them. *See* discussion *supra* Section I.

that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

Plaintiff relies on the testimony of Ms. Jackson-Pope and Ms. Boykin that Defendant "treats employees differently based upon race and that Black employees were more likely to be redeployed into less-desirable positions." Pl.'s Mem. Opp'n at 18. Plaintiff also points to Mitzi Carpenter, a white female, who he claims, "performed essentially the same duties." *Id.* While Plaintiff and Carpenter both worked on the PDT team in the business informatics area and were assigned roles on some of the same projects, Plaintiff fails to dispute that she did not engage in the same conduct nor have a disciplinary record. *Compare* Carpenter Aff. at ¶ 3, *with* Def.'s Mem. Supp. at 17. Specifically, Carpenter is not a "similarly situated" employee because she did not exhibit Plaintiff's pattern of absence, tardiness, incomplete work, or ineffective communication. *Mitchell*, 964 F.2d at 583. In other words, Plaintiff cannot point to Carpenter as an appropriate comparator because there are significant differentiating circumstances that distinguish their conduct or their employer's treatment of them for it.[19] *Id.*

Again, even if Plaintiff could establish a prima facie case, he abandons his burden of establishing pretext in response to Defendant's proffered legitimate and nondiscriminatory reasons. *Burdine*, 450 U.S. at 253; *McDonnell Douglas*, 411 U.S. at 804; *Heiko*, 434 F.3d at 258. Rather, Plaintiff claims the question of pretext is "a question for the jury" and summarily calls Defendant's proffered explanation into question because of the "subjective nature of the

---

[19] In his Complaint, Plaintiff also points to "David Hopkins, a white male with substantially less seniority than Plaintiff," who Defendant assigned as Plaintiff's supervisor after "den[ying] Plaintiff a promotion and demot[ing] him within the internal hierarchy." Compl. at ¶ 19. As a preliminary matter, the Court notes that it is disputed whether Plaintiff was denied a promotion and demoted. This dispute is immaterial, however, because Plaintiff abandons these claims in his opposition brief and Hopkins is not a similarly situated employee. *Celotex*, 477 U.S. at 323. Plaintiff fails to mention Hopkins as a comparator in his opposition brief, but the Court finds they are not similarly situated because Hopkins had received specific education and training that Plaintiff had not, and Hopkins had previously held the supervisor position that Plaintiff challenges. *See* discussion *supra* Section I; *see also* Def.'s Mem. Supp. at ¶ 28.

performance allegations against Plaintiff regarding communication and demeanor." Pl.'s Mem. Opp'n at 18-19. The only evidence Plaintiff points to is testimony "from upper management employees as to race playing a role in decision making and treatment of employees" and that "Rodgers admitted that he can be unknowingly 'racist.'" *Id.* at 18. However, conclusory allegations of racism's existence in the workplace are insufficient to establish that intentional discrimination was the true reason that Plaintiff experienced adverse employment actions. *See Hawkins*, 203 F.3d at 281 ("But this showing of a difference of opinion, coupled with [Plaintiff's] conclusory allegations of racism, cannot reasonably support the conclusion that [his] discharge was motivated by racial animus."); *see also Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 (4th Cir. 1989) ("[A] plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action.").

Thus, the Court finds that Plaintiff has failed to meet his burden of establishing a prima facie case and, even if he had, he fails to establish pretext. Defendant is therefore entitled to judgment as a matter of law, and, accordingly, Defendant's Motion for Summary Judgment is **GRANTED** as to Count Three.

## D.  Count Four: Title VII Retaliation

Title VII also prohibits, in relevant part, an employer from "discriminat[ing] against any of his employees . . . because he has opposed any practice made an unlawful employment practice." 42 U.S.C.A. § 2000e-3(a). The anti-retaliation provision seeks to prevent "an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006). To establish a prima facie case of retaliation, a plaintiff must prove: "(1) she

engaged in a protected activity, (2) the employer acted adversely against her, and (3) there was a causal connection between the protected activity and the asserted adverse action." *Hoyle v. Freightliner*, LLC, 650 F.3d 321, 337 (4th Cir. 2011). The *McDonnell Douglas* burden-shifting framework applies to Title VII retaliation claims. *See Walton v. Harker*, 33 F.4th 165, 177 (4th Cir. 2022). Moreover, unlike other Title VII claims, "Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . [which] requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Plaintiff alleges that Defendant discriminated against him "with regard to the terms and conditions of his employment . . . and ultimately terminating [him] due to his engagement in protected activities including making complaints to his supervisors and/or human resources, regarding harassment and discrimination based upon his race, or alternatively, what Plaintiff reasonably believed to be harassment and discrimination and/or a hostile workplace." Compl. at ¶ 48. Plaintiff also relies entirely on his argument with respect to his ADA retaliation claim to support his Title VII retaliation claim. *See* Pl.'s Mem. Opp'n at 19 ("Plaintiff's Title VII retaliation claim is virtually identical to his ADA retaliation claim with the exception of the reasonable accommodation aspect and summary judgment is inappropriate for the same reasons."). His Title VII claim, in turn, fails for the same reasons as his ADA claim.

Of course, "complain[ing] to superiors about suspected violations of Title VII" is protected oppositional activity. *Boyer-Liberto*, 786 F.3d at 281. As previously discussed, however, Plaintiff's complaints were not protected activities because the context in which Plaintiff communicated his complaint could not reasonably have led Defendant to understand its

nature.[20] *Burgess*, 466 F. App'x at 282. Plaintiff therefore fails to establish the first prong of his case. Yet, even if this were protected activity, Plaintiff nonetheless fails to establish any causal connection between these emails and his discharge.[21] *A Soc'y Without A Name*, 655 F.3d at 350.

Thus, the Court finds that Plaintiff has failed to establish a prima facie case for Title VII retaliation and Defendant is entitled to judgment as a matter of law. Accordingly, Defendant's Motion for Summary Judgment is **GRANTED** as to Count Four.

## IV.    CONCLUSION

For the foregoing reasons, the Court **FINDS** that Defendant Western Tidewater Community Services Board is entitled to judgment as a matter of law on all Counts. Accordingly, Defendant's Motion for Summary Judgment is **GRANTED**.

The Clerk is **DIRECTED** to provide a copy of this Order to counsel for all parties.

**IT IS SO ORDERED.**

Norfolk, Virginia
August  /  , 2022

Raymond A. Jackson
**United States District Judge**

---

[20] *See also supra* Section III.C.
[21] *See supra* note 15.